### REED v. CONTINENTAL STATE BANK OF BECKVILLE. (No. 736–4675.)

Commission of Appeals of Texas, Section A. Feb. 15, 1928.

1. **Principal and surety** ⬅➡16½—**Where G. signed, as surety, bond to secure performance of contract which had been transferred to him, he was "principal."**

Where bond, signed by H. as principal and G. and another as sureties, under which they bound themselves to pay certain sum, if oil well drilling contract was not faithfully performed, but contract had been transferred to G., he was in law a "principal" on bond, since it was in fact his own obligation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Principal.]

2. **Principal and surety** ⬅➡147(2)—**Money, deposited by principal in bank signing bond as surety to guarantee bank against loss, inured to benefit of creditor.**

Sum deposited by one who appeared on face of bond to be surety, but who was in fact a principal, in bank which also signed bond as surety, to guarantee bank against loss by reason of its signing bond, inured to benefit of creditor.

3. **Banks and banking** ⬅➡99—**Principal and surety** ⬅➡147(2)—**Where principal deposited money, later paid out, in bank signing bond as surety, to guarantee bank against loss, bank was liable to creditor, regardless of question of ultra vires.**

Where one who appeared on face of bond as surety, but who was in fact principal, paid sum representing amount of bond to bank, also signing as surety, to guarantee bank against loss by reason of its signing bond, and cashier handling transaction permitted deposit to be handled as general deposit, and wholly withdrawn by checks not connected with bond transaction, bank was liable to creditor for such amount, regardless of question of ultra vires, because it was benefited by transaction, and could have suffered no injury had it retained money so deposited to be applied to purposes for which deposit was made, since bank could not retain benefits of transaction and repudiate obligation.

4. **Banks and banking** ⬅➡116(1)—**Knowledge of cashier, individually interested, accepting deposit to guarantee bank against loss for signing bond as surety, was bank's knowledge.**

Knowledge of bank cashier, individually interested, of transaction whereby cashier accepted for bank, deposit by principal to guarantee bank against loss by reason of its signing bond as surety, was knowledge of bank as its "sole representative," where cashier's individual interests in transaction were not so adverse to those of bank as to compel parties to conclude that cashier would not hold deposit for purposes intended, since he, being officer and cashier of bank, had right to receive deposits.

5. **Mines and minerals** ⬅➡109—**Contract for drilling oil and gas well held not void for want of sufficient description of leases and lands conveyed.**

Contract between owner of oil and gas leases and another for drilling of test well for oil, gas, and other minerals under which driller was given right to select out of 2,500 acres the 1,000 acres he was to get under contract, and, if there was objection to title to any acreage selected, he had right to select other acreage, *held* not void for want of sufficient description of leases and lands conveyed.

Error to Court of Civil Appeals of Tenth Supreme Judicial District.

Action by R. L. Reed against the Continental State Bank of Beckville and others. Judgment for plaintiff was reversed in part and rendered by the Court of Civil Appeals (284 S. W. 265), and plaintiff brings error.

Judgment of Court of Civil Appeals reversed, and that of district court affirmed.

Harper & Harper, of Dallas, and J. S. Callicutt and Luther A. Johnson, both of Corsicana, for plaintiff in error.

J. F. O'Brian, of Fort Worth, C. S. Bradley, of Groesbeck, and Hyder & Batten and R. M. Rowland, all of Fort Worth, for defendant in error.

CRITZ, J. This suit was originally instituted in the district court of Limestone county, Tex., by R. L. Reed, plaintiff in error, against H. N. Harris, J. O. Galloway, and Continental State Bank of Beckville, Tex., a corporation. Trial in the district court resulted in a judgment for Reed against all the named defendants. The bank alone appealed to the Court of Civil Appeals for the Tenth District at Waco. That court reversed the judgment of the district court as to said bank, and rendered judgment in its favor. 284 S. W. 265. The case is now before this court on writ of error granted on application of R. L. Reed. The issues of the case are fairly stated in the opinion of the Court of Civil Appeals, and will not be repeated here. However, we make the following additional statement in order that our holding may be clearly understood:

The case is based on the following written contract:

"State of Texas, County of Limestone:

"Whereas, on the 22d day of April, 1920, and on various other dates following, the following named persons and landowners made, executed, and delivered certain oil and gas leases to C. H. Walton and R. L. Reed as lessees, covering the following described lands in the state of Texas, County of Navarro, to wit, J. E. and L. M. Cantrell, 73 acres; A. B. and Edith Evans, 100 acres; J. G. and Lydia Ward, 120 acres (and in the same manner various other leases are described and listed); and

"Whereas, said leases and all rights thereunder or incident thereto are now owned by R. L. Reed; and

"Whereas, the said R. L. Reed is desirous of securing the drilling of a deep test well for oil, gas and other minerals on said lands:

"Now, therefore, this contract made this the 10th day of October, A. D. 1921, by and between R. L. Reed of Cooledge, Limestone county, Texas, party of the first part and H. N. Harris, party of the second part, and all parties hereto recognizing the authority of each other to make this contract, witnesseth:

"That whereas, the party of the first part owns and controls leases on a large acreage of land in Navarro county, Texas, aggregating approximately 2,500 acres of land, and desires a well sunk for the purpose of exploration upon 1,000 acres of said land and whereas, the party of the second part desires and has agreed to sink such a well upon said portion of said land.

"The party of the second part undertakes and obligates himself to sink a well upon said land owned and controlled by the party of the first part in Navarro county, Texas, as herein above described, to a depth of not less than 3,300 feet, unless oil in paying quantities is found at a lesser depth, or unless the base of the Woodbine formation is penetrated at a lesser depth.

"It is a condition of this undertaking on the part of the party of the second part that the erection of a derrick shall be begun within twenty days from the date of this contract on some portion of the 1,000 acres, which is to be assigned by said first party to said second party, and that drilling operations shall be commenced on some portion of said land on or before November 10, 1921, and that thereafter the drilling on said well shall be continued without interruption except in case of accident or trouble over which neither party has any control.

"It is also agreed between the parties hereto that party of the second part executes a bond on this date in the sum of $5,000, to be deposited in escrow in the First National Bank of Cooledge, Texas, in favor of R. L. Reed, and, upon said bond being approved by R. L. Reed, party of the first part agrees to assign 1,000 acres of the above-described acreage to the party of the second part, to be selected by party of the second part out of the above-listed lands, and deliver said acreage to the party of the second part. That should the party of the second part fail or refuse to faithfully carry out this undertaking in the premises, then the damages to party of the first part resulting therefrom are hereby liquidated at the sum of $5,000, which party of the second part agrees to pay and hereby authorizes said bank to surrender said bond to the party of the first part upon the said failure or refusal. On the other hand, should the party of the second part faithfully perform and carry out the obligation and undertaking as herein above provided either by sinking a well not less than 3,300 feet in depth, or if oil or gas in paying quantities is found at a lesser depth than party of the first agrees, in such an event that the bond herein provided shall be returned to party of the second part. The party of the second part agrees and promises that after the assignment of said 1,000 acres to said second party that said second party will reassign to said first party 80 acres offset to said well not exceeding 500 feet distance from the location of said well.

"It is further agreed between the parties hereto that party of the first part does not agree to furnish abstract of title to any of said land, but in the event any portion of the said one hundred acres so assigned is defective or unsatisfactory to said second party that said first party will make further assignment of a like amount of acreage nearest to the 1,000 acres to party of the second part so that said second party will have the full amount of 1,000.

"In testimony hereof, witness our hands this the 10th day of October, A. D. 1921.
　　　　　　"[Signed]　R. L. Reed.
　　　　　　　　　"H. N. Harris.
"State of Texas, County of Tarrant:

"We, H. N. Harris, as principal, and J. O. Galloway, Continental State Bank of Beckville, Texas, as surety (or sureties), hereby bind and obligate ourselves to pay to R. L. Reed at Cooledge, Texas, the sum of $5,000, condition that the obligation contained in the foregoing

contract on the part of the said H. N. Harris shall be faithfully performed.

"Witness our hands at Fort Worth, Texas, this the 13th day of October, A. D. 1921. [Signed] H. N. Harris. J. O. Galloway. Continental State Bank of Beckville, Texas, by P. R. Nisbett, Cashier."

The case was submitted to the jury in the trial court on numerous special issues, and special issues Nos. 1, 2, and 3, with the answers of the jury thereto, which we deem important and controlling, are as follows:

"Special issue, No. 1: At the time the bond in this case was presented to R. L. Reed for acceptance, was he informed that J. O. Galloway had deposited with P. R. Nisbett, cashier of Continental State Bank of Beckville, Tex., a draft for $5,000, to guarantee said bank against loss in becoming surety on said bond? Answer 'Yes' or 'No.' Answer: Yes.

"Special issue No. 2: Did J. O. Galloway deliver to P. R. Nisbett, cashier of the Continental State Bank of Beckville, Tex., at the time of signing of the bond as surety, a draft of $5,000 to guarantee said bank against loss by reason of its signing said bond as surety? Answer 'Yes' or 'No.' Answer: Yes.

"Special issue No. 3: If you have answered issue No. 1 in the affirmative, then answer this question, Did R. L. Reed rely upon said statement that a draft for $5,000 had been deposited with P. R. Nisbett, cashier of the Continental State Bank of Beckville, Tex., by J. O. Galloway to guarantee said bank against loss by reason of its signing said bond as surety in accepting said bond? Answer 'Yes' or 'No.' Answer: Yes."

The effect of the verdict of the jury on the above issues is to establish by such findings: (a) That, at the time the bond in this case was presented to R. L. Reed for acceptance, he was informed that J. O. Galloway had deposited with P. R. Nisbett, cashier of Continental State Bank of Beckville, Tex., a draft for $5,000 to guarantee said bank against loss in becoming surety on said bond; (b) that J. O. Galloway did deliver to P. R. Nisbett, cashier of Continental State Bank, of Beckville, Tex., at the time of the signing of the bond as surety, a draft for $5,000 to guarantee said bank against loss by reason of its signing said bond as surety; and (c) that R. L. Reed relied on the statement that a draft for $5,000 had been deposited with P. R. Nisbett, cashier of said bank, by J. O. Galloway, to guarantee said bank against loss by reason of its signing said bond as surety, in accepting said bond.

The evidence further shows without conflict that said draft for $5,000 was promptly deposited in said bank by Nisbett, its cashier, but was deposited in the name of Old Colony Petroleum Company. It was also shown that Nisbett was the only person connected with said bank that had any knowledge of the transaction, prior to the time the money was paid out by said bank on checks not connected with the matter at issue in this suit.

[1] It is shown by the uncontroverted evidence that the contract was originally executed between Harris and Reed, and that the contract was later transferred by Harris to J. O. Galloway, who agreed to make the bond. After the transfer to Galloway, he (Galloway) had the bond written, and Harris, Galloway, and the bank signed it. On the face of the bond, Harris appears as principal, and Galloway and the bank as sureties. Under such circumstances Galloway became in fact and in law a principal on said bond, as it was in fact his own obligation, and the transaction amounted to Galloway putting up the $5,000, which was his own money, to secure his own obligation. Hawkins v. Western National Bank (Tex. Civ. App.) 145 S. W. 723. Certainly under the above facts Galloway became in law and in fact a principal debtor.

There is no question that under the facts and findings of the jury and judgment of the trial court Galloway forfeited his contract, and that he was justly due Reed the $5,000 as liquidated damages.

[2] Under the above facts and findings, we are of the opinion that the $5,000 deposited by Galloway in said bank inured to the benefit of Reed. Magill v. Brown, 20 Tex. Civ. App. 662, 673, 50 S. W. 143 (see body of opinion, page 149).

In the Magill Case, supra, the Court of Civil Appeals, speaking through Judge Key, says:

"On this subject a standard author announces the law in these words: 'As a general rule, where a surety, or a person standing in the situation of a surety, for the payment of a debt, receives a security for his indemnity, and to discharge such indebtedness, the principal creditor is, in equity, entitled to the full benefit of that security, and it makes no difference that such principal creditor did not act upon the credit of such security in the first instance, or even know of its existence. "The authorities place the principle upon the ground that, as the security is a trust created for the better securing of the debt, it attaches to it; and hence it is that it may be made available by the creditor, although unknown to him." The right of the creditor is the same when the security is a mortgage or other lien given the surety by the principal after the principal and surety have both become bound, even though there may have been no previous agreement that indemnity should be given. To entitle the creditor to enforce this right in equity, it is not necessary that he should have exhausted his remedies at law, or have reduced his debt to judgment.' Brandt, Sur. § 324. The author supports these propositions by numerous authorities that are cited, and they are upheld by others that are not cited. Morrill v. Morrill, 53 Vt. 75 [38 Am. Rep. 659]; Cooper v. Middleton, 94 N. C. 86; Manufacturing Co. v. Powell, 78 Tex. 53, 14 S. W. 245; Bank of Bellville v. Wheeler [Tex. Civ. App.] 33 S. W. 1093; same case, on second appeal [Tex. Civ. App.] 41 S. W.

376. And some authorities hold that, when security is given merely for the purpose of indemnifying the surety, the creditor, upon maturity of his debt, is entitled to the benefit of such security, whether the surety has been damnified or not, and irrespective of the question whether the surety or principal—either or both —is solvent. Morrill v. Morrill, 53 Vt. 75 [38 Am. Rep. 659], and cases there cited. There are other authorities that hold that, when the mortgage or other security is given for the purpose of indemnity only, the creditor can only reach such security by way of subrogation, after the surety has been damnified; and others, perhaps, that make the right of the creditor to enforce the security depend upon the insolvency of the principal debtor and the surety. But, however this may be, there appears to be practical unanimity of authority upon the proposition that when the principal debtor has provided a fund in the hands or subject to the control of the surety for the payment of the debt, whether such fund be provided by mortgage on real or personal property, or by pledge of bonds, notes, or other character of security, the creditor can claim the benefit of such contract, foreclose the lien thereby created, and have the property applied to the payment of his debt. Property thus placed under the control of the surety is impressed with a trust in favor of the creditor; for, as said by the Supreme Court of the United States in Hampton v. Phipps, 108 U. S. 264, 2 S. Ct. 624 [27 L. Ed. 719]: 'When a debtor who has given personal guaranties for the performance of his obligation has further secured it by a pledge in the hands of his creditor, or an indemnity in those of his surety, it is conformable to the presumed intent of all the parties to the arrangement that the fund so appropriated shall be administered as a trust for all the purposes which a payment of the debt will accomplish; and a court of equity, accordingly, will give to it this effect. All this, it is to be observed, as the rule verbally requires, presupposes that the fund specially pledged, and sought to be primarily applied, is the property of the debtor, primarily liable for the payment of the debt; and it is because it is so that equity impresses upon it the trust which requires that it shall be appropriated to the satisfaction of the creditor, the exoneration of the surety, and the discharge of the debtor. The implication is that a pledge made expressly to one is in trust for another, because the relation between the parties is such that that construction of the transaction best effectuates the express purpose for which it was made.' "

[3] We are further of the opinion that the bank is liable to Reed in the sum of $5,000, and that regardless of the question of ultra vires. It was engaged in the business of receiving deposits. It received a deposit of $5,-000 as a result of this transaction, and was thus benefited by the transaction, and could have suffered no injury had it retained the money so deposited to be applied to the purposes for which the deposit was made. It will not be permitted to retain the benefits of the transaction and repudiate the obligation. In this connection we expressly disclaim passing on whether or not the transaction as to the bank was ultra vires. A decision of that question is not necessary to a decision of this case. What we hold is that, regardless of that question the bank would be liable, as it cannot retain and enjoy the fruits and benefits of the transaction and repudiate the contract.

[4] It is urged by the bank that, since the evidence conclusively shows that no officer or agent of the bank had any notice of the transaction in question, or the purpose of the deposit until after the money had been paid out on other transactions, except P. R. Nisbett, and it being conclusively shown that Nisbett was the owner of leases in the neighborhood of Beckville, that he was in Fort Worth at the time he received the $5,000 draft, for a consultation with Galloway with reference to development of same, and received the draft in Fort Worth and not in the bank, and it being further shown that he deposited the money in the name of the Old Colony Petroleum Company, and because he had a personal interest in securing the development of the lands covered by his own leases by Galloway, or the Old Colony Petroleum Company of which Galloway was the president, which interests induced him to sign the name of the bank to the bond, and because of his lack of authority to do so, his knowledge of the true situation cannot, in law, be imputed to the bank, and that, such being the case, it cannot be said that appellant received the proceeds of such draft as such, nor that it knowingly received or retained the benefits thereof. We cannot assent to this proposition. Nisbett, being an officer and cashier of said bank, had the right to receive deposits, and, he being the only officer or agent of said bank who had any knowledge or connection with the transaction, his knowledge was the knowledge of the bank, as its "sole representative." Goldstein v. Union National Bank, 109 Tex. 555, 213 S. W. 584.

In the Goldstein Case, supra, it is shown that a mercantile company was indebted to the bank to the full amount the law permitted it to loan to any one customer. A third party, jointly with the president and general agent of the bank, executed to the bank an accommodation note, which was discounted, and the proceeds placed to the credit of the mercantile company. The bank, by its said agent, his comaker of the note, and the mercantile company, agreed that the latter would make deposits in the bank from time to time, and that these should be applied to discharge this note before any part thereof should be applied to any other indebtedness of the mercantile company to the bank, or checked out for any other purposes by the depositor. The application was not made, and the failure to do so was pleaded by the defendant, joining with the vice president, in making the note

as releasing him when sued thereon. The entire transaction on the part of the bank was concluded by its vice president, who was co-maker of the note. Under such circumstances our Supreme Court, speaking through Judge Hawkins, Judge Greenwood concurring, held that the knowledge of the agreement to so apply the deposits on the part of its general agent, though he was personally interested in the transaction, was to be imputed to the bank, and that it was bound by the agreement and this even though said agent was the only representative of the bank having knowledge of the transaction. Under such circumstances such agent would be the "sole representative" of the bank.

Also in the Goldstein Case the rule and its exceptions are very aptly and clearly stated as follows:

" 'The law imputes to the principal, and charges him with all notice or knowledge relating to the subject-matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority. * * * Provided, however, that such notice or knowledge will not be imputed: (1) Where it is such as it is the agent's duty not to disclose; (2) where the agent's relations to the subject-matter are so adverse as to practically destroy the relation of agency; and (3) where the person claiming the benefit of the notice, or those whom he represents, colluded with the agent to cheat or defraud the principal. This rule does not depend, in either case, upon the fact that the agent has disclosed the knowledge or information to his principal; subject to the exceptions named, the law conclusively presumes that he has done so, and charges the principal accordingly.' 2 Mechem on Agency (2d Ed.) § 1813. See, also, section 1825. "Eliminating from consideration the elements of actual knowledge through another source, and ratification, the true test, as to notice, in cases of this character, is, we think, not whether there is some slight adverse interest existing in the agent, although, to much greater extent, his individual interests in the transaction are entirely consistent with the interests of his principal, but whether, in the premises, and under all the circumstances of the particular case, the agent's interests are so incompatible with the interests of his principal as practically to destroy the agency or to render it reasonably probable that an ordinary person, in the agent's position, under such circumstances, will neither act, in behalf of his principal, upon his so acquired knowledge, nor disclose that knowledge to his principal, but, because of such incompatibility in interests, will withhold such knowledge from the principal."

In the case at bar we do not find such facts as would justify this court in holding, as a matter of law, that Nisbett's agency, as an active general officer and cashier of said bank, did not exist throughout the making of the contract and the receipt of the $5,000 for the purposes stated and found by the court and jury, and we cannot see that his individual interests in the entire transaction were so adverse to those of his bank as reasonably to induce and compel, in the mind of Reed or Galloway, situated as he was, the conclusion that Nisbett would not hold and apply the $5,000 so deposited to the purposes for which it was received, and the transaction would imply no reason why he should not inform some other officer of said bank of the reasons and purposes of said deposit. The bank was engaged in the business of receiving deposits of money, and the receipt of the $5,000 as a deposit by said bank could not result in any loss to the bank, but under the very nature of the transaction, would, as viewed from the standpoint of Reed, be advantageous to the bank; it receiving by the transaction money to the extent of all liability named in the bond. Certainly under such circumstances, as viewed from the standpoint of Reed, there was no cause for Reed to believe that Nisbett had any reason to withhold knowledge of the purposes of the deposit from any other officers and agents of the bank. It therefore follows that notice to Nisbett was notice to the bank.

[5] Defendant bank very ably presents the propositions that the contract in question is void for want of sufficient description of the leases and lands conveyed. We overrule these contentions. Reed had oil leases on approximately 2,500 acres of land in Navarro county, Tex. Under the terms of the contract, he was obligated to assign to Harris any portion of said lease to the extent of 1,000 acres. Harris was given the right to select out of the 2,500 acres the 1,000 acres he was to get under the contract. If there was any objection to the title to any acreage selected, Harris had the right to select other acreage. The naming of the parties, the acreage of each, and tender of leases, with definite description of the land of record, satisfies all the requirements of the statute.

We recommend that the judgment of the Court of Civil Appeals be reversed, and that the judgment of the district court be affirmed.

GREENWOOD and PIERSON, JJ. Judgment of the Court of Civil Appeals reversed, and that of the district court as to all parties affirmed, as recommended by the Commission of Appeals.