THE STATE NATIONAL BANK OF MARSHALL v. W. D. TITTLE.

No. A-184. Decided November 15, 1944.
Rehearing overruled December 20, 1944.
(183 S. W., 2d Series, 720.)

*Jones & Jones,* of Marshall, for petitioner.

The Court of Civil Appeals erred in assuming that W. M. Thomas (the cashier and chief executive of the plaintiff bank and also the financial manager of the Waterman Brick & Tile Company) acted as the duly authorized agent of the bank, in making the agreement with respondent, despite the uncontroverted testimony, the finding of the jury, and the implied finding of the trial court, all to the contrary. Blaffer v. Powers, 169 S. W. (2d) 536; Goldstein v. Union National Bank of Dallas, 216 S. W. 409; General Am. Life Ins. Co. v. Anderson, 46 Fed. Supp. 189.

*Sam B. Hall, Abney & Abney* and *Carey M. Abney,* all of Marshall, for respondent.

The testimony of the bank officials show that Thomas was duly authorized to act for the bank at the time he did act. The bank was bound by his acts and charged with all knowledge that came to him in the transaction. Bailey v. Babcock, 241 Fed. 501; California Natl. Bank v. Kennedy, 167 U. S. 362, 42 L. Ed. 198; Foard County v. Stanifer, 105 Texas 420, 151 S. W. 523; 10 Tex. Jur. 313.

MR. JUDGE BREWSTER, of the Commission of Appeals, delivered the opinion for the Court.

This is a suit on a note brought by the State National Bank of Marshall, petitioner, through its voluntary liquidating committee, against. W. D. Tittle, respondent. A trial court judgment on special issues for petitioner was reversed by the court of civil appeals and rendered for Tittle. 179 S. W. (2d) 1010.

Tittle's defense was that the note was an accommodation note. He alleged that on December 31, 1941, petitioner, a national bank with a capital stock of $100,000.00 and a surplus of $50,000.00, was not permitted by law to lend more than $15,000.00 to any customer; that Waterman Brick & Tile Company, a corporation, was then indebted to petitioner on notes for approximately $15,000 and on overdrafts of approximately $10,000.00, which was in excess of what the law allowed petitioner to lend it. He alleged that the brick company had a contract with the United States to furnish its products in the construction of an ordnance plant but did not have the funds either to fulfill its contract or to liquidate its overdraft with petitioner; that the government then owed the brick company about $57,-000.00 for materials already delivered but that payment "was being delayed by the usual * * red tape encountered in dealing with the government"; that petitioner and the brick company, "both acting through W. M. Thomas, who was duly authorized to act for each of them" in securing funds to pay the overdraft and to enable the brick company to continue, approached . him and agreed that if he would execute to petitioner his note for $3,000.00 and allow the proceeds to be used "to take up checks which the Brick Company had drawn on the plaintiff, and which plaintiff had paid and had not charged to the account of the Brick Company because its funds on deposit were insufficient," the first money received for the brick company on its contract

would be applied to payment of the note and that he would never be called upon to pay it. He alleged that this note was renewed on April 7, 1942, under Thomas' representations that the money due the brick company had not come in but would, be applied to the note when received and that Tittle would never be required to pay the note; that on July 17, 1942, he executed the note sued on in renewal of the balance due on the prior note, Thomas representing that only $1,000.00 had come in for the brick company on the ordnance plant contract and renewing the other representations made when the original note and its first renewal were executed. He alleged reliance upon these representations in each instance and that otherwise he would not have executed the original note or either of its renewals. He alleged that the agreement had with Thomas when he executed the original $3,000.00 note operated as an assignment of enough of the money to become due on the brick company's contract to liquidate the note, and that when the bank received that money it took the same in trust for his benefit to hold him harmless on the note. He alleged that from January 13, 1942, to March 27, 1942, $36,084.39 was paid "to the Brick Company and to the plaintiff" on the ordnance plant contract, but that, in violation of the agreement with him, these sums were withdrawn by petitioner from the brick company's account and applied to the payment of the overdrafts and other obligations owing it by the brick company.

Petitioner answered that if the agreement was made it presented a scheme by Tittle and Thomas to evade the national banking laws, and "to deceive the stockholders of plaintiff Bank, as well as its creditors and those in public authority"; that thereby Tittle "joined in making a false material statement, or causing the over-valuation of security or assets, which he knew or was charged with knowledge would be reported as a part of the assets of plaintiff Bank"; that the agreement was against public policy because it was an effort to conceal the true condition of petitioner's assets and the brick company's account. Further, petitioner denied that it was accommodated by the transaction, which was for the benefit of either Thomas or the brick company in which Thomas was financially interested; that the proceeds of Tittle's $3,000.00 note were by him loaned to Thomas in return for the latter's promissory note for that amount; that Thomas' effort to bind it in the matter of the brick company's overdraft was beyond his authority and so foreign to customary banking transactions as to charge Tittle with notice that Thomas could not bind petitioner thereby; and that Thomas was acting either for the brick company or himself in

a matter wherein their interest was wholly adverse to petitioner's interest.

Tittle replied that in making the note he was merely lending his credit to petitioner to make a lawful disposition of the brick company's overdraft, already in existence, believing that petitioner would show by its record the conditions under which it was given; and that if petitioner's allegations were true it took his note and made its agreement with him as a part of an "illegal and fraudulent scheme" of which he had no knowledge and with which he had no connection, other than as its innocent victim. He replied, further, that after the agreement had been made Thomas wrote the note, gave a deposit slip, prepared a check of the proceeds from Tittle to himself, and said that he would use the money to liquidate the overdraft of the brick company; that Thomas then voluntarily executed to Tittle his personal note for $3,000.00 and told Tittle "to keep it for his record and for the personal guaranty of Thomas that the Brick Co. and plaintiff would keep its agreement with defendant."

Petitioner answered that if Tittle was seeking to lend it his credit, he knew or was charged with notice that Thomas had no authority to borrow money in its name except upon express authorization of its directors, which had not been conferred; that Thomas did not conceal from Tittle the purpose for which the note was given; but that if Thomas failed in any respect as to any agreed limitations on Tittle's notes he was, as to such "defalcations," Title's agent and not petitioner's.

Tittle's testimony substantially supported his allegations. Thomas testified that the note transactions were entirely personal between him and Tittle and that there was no agreement for petitioner to apply on the ordance plant contract any funds deposited with it to the brick company's credit. He further testified, "Well, I told Mr. Tittle I was interested in the brick plant down there, they owed me about $25,000.00 and the bank let them have all they could and wanted me to let them have some more money and I wanted to borrow $3,000.00." He said that the $3,000.00 realized on the Tittle note went into the brick Company's account.

The jury found (1) that when Tittle executed the original note, Thomas agreed with him that it would be paid out of funds received by the brick company under its contract to furnish materials to construct the ordnance plant; (2) that this agreement was not the sole consideration to Tittle; (3) that it did

not induce Tittle to execute the note; (4) that when the agreement was made Thomas did not intend to perform it; (5) that when Tittle executed the first renewal note Thomas represented to him that no payments had been received by the brick company on its contract; (6) that in executing this renewal note Tittle believed this representation, and (7) was induced thereby to execute the renewal note; (8) that when Tittle executed the $2,000.00 renewal note sued on Thomas represented that only $1,000.00 had been received by the brick company on its ordnance plant contract; (9) that Tittle believed this representation, and (10) was induced thereby to execute this renewal note; (11) that when Tittle executed the original $3,000.00 note Thomas represented to him that he, Thomas, would apply its proceeds in payment to petitioner of an overdraft of the brick company; (12) that Tittle believed this representation; (13) that when Tittle executed the original $3,000.00 note, he accepted a $3,000.-00 note of even date, signed by Thomas, as a part of the consideration; (14) that on December 31, 1941, Tittle borrowed $3,000.00 for the sole purpose of lending it to Thomas; (15) that Tittle's original note was executed for the sole purpose of procuring $3,000.00 to lend Thomas "personally"; (16) that Tittle executed the renewal note sued on for the sole purpose of accommodating Thomas; and (17) that Thomas' $2,000.00 note to Tittle, of even date, was given solely because of Tittle's accommodation of Thomas in giving the note sued on.

Four points of error contend (1) that the transaction on December 31, 1941, between Thomas and Tittle constituted a scheme to violate the national banking laws; (2) that Thomas did not act as petitioner's agent in making the agreement with Tittle; (3) that the "sole actor" doctrine is not applicable to Thomas' part in the transaction; and (4) that the agreement violated the parol evidence rule because it changed the time and manner of paying the note.

■ We have concluded that the first three points are foreclosed by the decision of this Court in Goldstein v. Union National Bank et al, 109 Texas, 555, 213 S. W., 584, which has been cited with approval in numerous later cases, e. g., Reed v. Continental State Bank (Com. App.), 2 S. W. (2d) 426; First Guaranty State Bank v. Liberty National Bank (Civ. App.), 260 S. W., 660 (er. dism.); Mays v. First State Bank (Com. App.), 247 S. W. 845; Vogel et ux v. Zipp et al, (Civ. App.), 90 S. W. (2d) 668 (er. dism.).

In the Goldstein case one Walker was at once active vice-president and general manager of a national bank and a con-

trolling stockholder and director of a millinery company. The millinery company was indebted to the bank in the sum of approximately $20,000.00, $15,000.00 of which was in notes with the remainder carried as an overdraft. $20,000.00 was all the bank could lawfully lend any customer, hence it was impossible for the bank to furnish the millinery company all the money it required at times to carry on its business. So the millinery company and the bank, through Walker, agreed with one Goldstein that, as need should arise, Goldstein and Walker would execute notes to be discounted by the bank and the proceeds used by the millinery company in some way other than reducing its indebtedness to the bank. The millinery company agreed to make deposits with the bank in usual course of business, which deposits should be applied to any notes of Goldstein and Walker which the bank might then hold under the agreement. The bank agreed that it would apply these deposits to any such Goldstein and Walker notes and not to the $20,000.00 owed it by the millinery company.

Sued by the bank on a note executed by himself and Walker, Goldstein alleged that it was made and discounted by the bank and its proceeds used by the millinery company under the aforesaid agreement; that after the note had been so discounted the millinery company deposited with the bank more than enough money to pay the note, but that the bank disregarded its obligation to apply the deposits to the note and applied part of them to the $20,000.00 owed it by the millinery company and permitted the millinery company to check out the remainder; that, therefore, the note sued on had been paid.

For special exception to this answer, the bank urged that if Walker made the agreement his interest was adverse to that of the bank and it would not be bound thereby unless notice was brought to it through some other and proper source. In support of this proposition, the bank contended that the transaction was, in effect, an additional loan to the millinery company in violation of the national banking laws, hence was a fraud upon the bank. In overruling that contention this court said: "To said claim of fraud the obvious answer is that said loan was not made to the millinery company. The note taken therefor was signed by Goldstein and Walker individually, and not by the millinery company, and that company never became liable thereon as an undisclosed principal, and thereby the antecedent indebtedness of the millinery company to the bank was not increased. Inasmuch as the transaction constituted no violation

of the banking law, it was not, for that reason, a fraud upon the bank."

So, in the case at bar, the brick company never became liable on the note as an undisclosed principal, hence its indebtedness to petitioner was not thereby increased. On the contrary, the effect of the transaction was to decrease it in the sum of $3,000.-00. It is true, as petitioner contends, that the jury found that Tittle borrowed the $3,000.00 "to lend Thomas personally." Nevertheless the jury also found that Thomas agreed with Tittle that the note would be paid out of funds thereafter to be realized by the brick company on its ordnance plant contract as they were deposited in the bank, which agreement was renewed at the two subsequent renewals of the note, and Thomas testified that the money got by him in the transaction "went into the brick company accounts."

Moreover, the overdrafts by the brick company and the resulting illegal, excessive indebtedness of that company were already in being when the agreement in question was made, so the law against excessive indebtedness was not violated by Tittle giving his note.

Nor did the transaction amount to a falsification of the bank's books because Tittle's note was a valid and binding obligation to the bank unless and until deposits from the ordnance plant contract, sufficient to pay it, were thereafter made by the brick company in the bank.

Therefore, it seems to us that no rule of law or of public policy would render the agreement invalid. We see nothing in the record that would make the transaction illegal. We overrule the first point of error.

■ Petitioner's second point of error presents the proposition that Thomas was not its agent in making the alleged agreement with Tittle. Thomas was vice president, cashier and "an executive officer" of petitioner with authority to make loans, and he had been instructed by petitioner's board of directors to liquidate the brick company's excessive indebtedness. His transaction with Tittle was an act done to reduce that indebtedness and was, therefore, not adverse to petitioner's interests. On the contrary, it brought petitioner a present and positive benefit. It was in no way unlawful. So we think that it was clearly within the scope of Thomas' general agency and that his knowledge of the agreement to pay Tittle's note out of future deposits

by the brick company must be imputed to petitioner, his principal.

Under similar facts in the Goldstein case, supra, this court said: "We do not find presented in this instance such facts as would justify a court in holding, as a matter of law, that Walker's general agency did not exist throughout the making of said general agreement, or that his individual interests in the premises were so adverse to those of his bank as reasonably to induce and compel in the mind of an ordinary person situated as was Goldstein the conclusion that Walker would neither enforce on the part of his bank said agreement for payment of said $5,000.00 note out of future deposits of the millinery company, nor inform some other officer of said bank of the terms of said agreement. * * Said loan seems to have been made in regular course of the bank's business, and within the scope of Walker's authority as a general officer of his bank, and the note was retained and sued on by the payee."

The second point is overruled, so it is unnecessary to consider the third.

■ We overrule the fourth point of error. The oral agreement between Tittle and Thomas was that later deposits of the brick company with petitioner bank would be applied to payment of the note. The record shows that more than enough deposits to extinguish the note were later so made. This amounted, therefore, to pleading and proof of its payment, and payment is provable by parol. Ellington v. Commercial State Bank, 15 S. W. (2d) 59, (Com. App.), 24 S. W. (2d) 359, citing Goldstein v. Union National Bank of Dallas (Civ. App.), 216 S. W., 409.

The judgment of the Court of Civil Appeals is affirmed.

Opinion adopted by the Supreme Court November 15, 1944.

Rehearing overruled December 20, 1944.