**FIRST HEIGHTS BANK, FSB, Appellant,**

v.

**Jorge GUTIERREZ, Receiver for Rio Grande Savings and Loan Association, Appellee.**

**No. 13–91–366–CV.**

Court of Appeals of Texas, Corpus Christi.

March 18, 1993.

Rehearing Overruled May 6, 1993.

Ann S. Duross, Asst. Gen. Counsel, and Colleen B. Bombardier and Maria Beatrice Valdez, F.D.I.C., Washington, DC, amicus curiae.

Ronald A. Piperi, H. Miles Cohn, David C. Holmes, Honigman, Miller, Schwartz & Cohn, Houston, Rene O. Oliveira, Roerig, Oliveira, & Fisher, Brownsville, for appellant.

John B. McFarland, Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, Reynaldo G. Garza, Jr., Garza & Garza, Brownsville, Michael Diehl, Graves, Dougherty, Hearon & Moody, Austin, for appellee.

Before DORSEY, KENNEDY and FEDERICO G. HINOJOSA, Jr., JJ.

### OPINION

DORSEY, Justice.

This case concerns the successors of two failed savings and loan institutions and involves an intricate loan transaction between the failed thrifts. Rio Grande Savings and Loan, the Plaintiff below, contended that a loan made to it by appellant [1] was fraudulent and illegal, and that the note evidencing it was void, or, in the alternative, that the loan had been repaid. Appellant proclaimed the validity of the loan transaction in a counterclaim and asserted that the entire balance on the note was due and payable. After a jury trial, the trial court upheld the validity of the note in its judgment on the verdict, but held that a substantial portion of the note had been repaid by appellees. The judgment on the verdict also adopted the jury's finding that the loan transaction was fraudulently in-

---

1. Rio Grande entered into the loan transaction at issue with First Savings Association of Orange. Orange became insolvent and was placed into the receivership of the Federal Savings & Loan Insurance Corporation (FSLIC). Heights of Texas, FSB, entered into an acquisition and assumption agreement with the FSLIC, acquiring all of Orange's assets and assuming its secured liabilities. Heights of Texas merged with another institution to create First Heights Bank, FSB. First Heights intervened in this lawsuit, replacing Orange and the FSLIC as the party in interest on payment of the note.

duced by one of First Heights's co-defendants.

By forty points of error, First Heights appeals. Appellant primarily contends that the *D'Oench Duhme* [2] doctrine applies to bar all claims and defenses asserted by plaintiffs below, that the jury charge was inadequate to support the judgment, and that no evidence existed to support either the findings the jury did make or the judgment. Appellant complains that the trial court had no jurisdiction and that venue was improper. Review of certain procedural and evidentiary rulings is also sought. The judgment of the trial court is modified and, as modified, affirmed.

## I. FACTS

In January 1986, Rio Grande, an uninsured savings and loan institution,[3] was declared insolvent. At that time, First Savings Association of Orange, an insured institution,[4] was nearing the end of its fiscal year on June 30, 1986, and held certain promissory notes evidencing nine outstanding development loans. These loans were in default and totalled $71 million. In order for Orange to make a profit and show a favorable financial position on its end-of-year audit, these delinquent loans had to be closed out. To accomplish this, the properties had to be sold to new buyers.

Ronald Piperi, Orange's President, approached Fincher Investment Co., the parent of Rio Grande, and asked for a $15 million loan from Rio Grande to assist in the re-purchase of those nine properties.[5] While the re-purchase of the properties would serve to partially pay off the $71 million in delinquent notes held by Orange, Orange Service Company, Orange's wholly-owned subsidiary, held an interest in 75% of the profits from eight of the properties and a 50% profits interest in the ninth. Orange Service would obtain profits from the sale if the new buyers made down payments of at least $15 million. Accordingly, Piperi asked Rio Grande to loan the buyers $15.1 million, with Orange loaning almost $861,000, for the necessary down payment. Orange would then loan an additional $71 million to the new buyers to complete the sale, closing out the delinquent loans and substituting the new ones as current assets.

Fincher and Rio Grande told Piperi that it did not have sufficient capital to make a $15 million loan. Piperi responded that Orange would loan the money to Rio Grande, and Rio Grande could then invest it as Piperi directed. Fincher and Rio Grande management decided to enter into the transaction.

On June 26, 1986, Rio Grande wrote a promissory note to Orange in the amount of $20 million.[6] To secure the note, Rio Grande pledged 465 first-lien real estate notes held by it, totalling more than $18 million in value.

On June 30, 1986, Orange wired a total of approximately $15.4 million to Rio Grande in two separate transfers, the first for $14.5 million and the second for $980,000. After Orange made the first transfer, Rio Grande wired approximately $14.1 million of that money back to Orange the same day, to be deposited into an escrow account with National Title Company.[7] $10.3 million of this money was Orange Service's profit participation in the sale of the nine properties to the new buyers. $3.8 million made up the sellers' profits. However, the sellers' profits went directly into the escrow account to guarantee suffi-

---

**2.** *D'Oench Duhme & Co., Inc. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

**3.** Rio Grande is a wholly-owned subsidiary of Fincher Investment Company.

**4.** Late in 1986, First Savings of Orange was renamed Champion Savings Association.

**5.** The companies had previous dealings with each other. In May, 1985, Orange made a $2 million loan to Rio Grande in an attempt to help Rio Grande in its deteriorating condition.

Rio Grande invested that money into a project called Playa del Rio, to be discussed more fully later. Orange invested in this project as well.

**6.** This note included the $2 million Playa del Rio loan Orange made to Rio Grande in 1985, which had not yet been repaid.

**7.** National Title Company was an 80%-owned subsidiary of Orange.

cient cash flow to service the debt, in the event the new owners would be unable to make payments to Orange during the first year of ownership.

Orange then made the second transfer for $980,000 to Rio Grande, which was wired back to Orange on the same day and into the same National Title account. This money was National Title Company's fee for effectuating the closings on the property sales.

Orange then tendered an additional $71 million to the buyers of the nine properties in the form of non-recourse loans. This closed out the original development loans in default and enabled Orange to start anew, claiming assets in the form of accounts receivable of $71 million in current loans in good standing. Orange maintained first lien status on the nine properties. These new assets, in addition to Orange's subsidiaries' profits, resulted in Orange's immediately showing a profit on its financial audit at the end of its fiscal year, June 30, 1986.

Rio Grande was given second liens on the same nine properties to secure the $15.1 million non-recourse loans to the purchasers. A total of $86 million was loaned to purchase the properties; the buyers paid no money of their own. However, the appraised value of the properties was well below the $71 million loaned by Orange.

The properties did not generate enough income to pay the loans the buyers received from both Rio Grande and Orange. Neither bank received payments on those loans, and all went into default.

Meanwhile, Rio Grande made no payments on the $20 million note due Orange. Rio Grande maintained that it repaid the loan when that money was sent directly back to accounts at Orange held in the names of two of Orange's subsidiaries. Rio Grande contended that the profits of Orange's subsidiaries were Orange's. It was Orange's position, however, that Rio Grande failed to make the necessary payments on the note and therefore was in default on its full amount.

On May 12, 1987, the Texas Savings & Loan Department placed Rio Grande under receivership and in liquidation on April 28, 1988. Jorge A. Gutierrez, an appellee, was appointed liquidating agent by the Texas Savings & Loan Commissioner and later appointed receiver in 1990. On May 9, 1988, Orange (by then renamed "Champion Savings and Loan") filed suit in Orange County against Rio Grande and Gutierrez seeking payment of the balance due on the $20 million note and judicial foreclosure on the securing collateral, the 465 real estate liens.

Gutierrez filed suit in Cameron County on May 19, 1988, against Orange, Piperi, and former Rio Grande directors at Fincher Investments, among others. He alleged fraudulent inducement and conveyance with regard to the loan transaction, and requested a declaration that the entire loan transaction be rescinded and that the indebtedness under the note be canceled. Gutierrez asked for injunctions and constructive trusts on the collateral involved in the transaction to prevent Orange from foreclosing on or assuming those 465 loans and 9 liens.

Orange moved to transfer venue in Gutierrez's Cameron County case to Orange County, contending that an injunction against Orange's foreclosure suit must be brought in the county in which the foreclosure action is pending, and, in the alternative, that Orange's principal place of business was in Orange County. Orange filed a plea in abatement as well, asserting that all of the claims filed by Rio Grande were compulsory counterclaims which should have been filed in the Orange County case. The trial court denied the motions and retained Gutierrez's case in Cameron County. Gutierrez subsequently filed Plaintiffs' Third Amended Petition, in which he formally rejected and denied Orange's demand for payment on the $20 million note. Orange filed no further pleadings.

On September 23, 1988, the Federal Home Loan Bank Board declared Orange insolvent and closed it. The Federal Savings and Loan Insurance Corporation (FSLIC) was appointed receiver. That day, Heights of Texas, FSB (later First Heights), acquired Orange's assets and as-

sumed both its deposit and secured liabilities. In October, 1988, the FSLIC sought to remove Rio Grande's case against Orange to Federal Court. After the case was removed, First Heights Bank intervened and, having assumed substantially all assets and liabilities of Orange, replaced First Savings Association of Orange and the FSLIC in the federal court action. All federal claims were dismissed and the case was remanded to the court in Cameron County with First Heights and Piperi the primary defendants.

The jury's verdict essentially found:

1. The money loaned to Rio Grande was for the benefit of Orange;

2. Orange was the actual owner of the nine properties;

3. The $15.1 million loaned to the new buyers was in fact a partial payment of the note to Orange;

4. All of the information was contained in the loan files of Orange;

5. Piperi was guilty of fraud;

6. Rio Grande did not receive adequate consideration for the 465 loans it pledged, in that it gave those notes to Orange in exchange for second lien status on the nine properties.

The court entered judgment on the verdict, which:

1. Upheld the validity of the $20 million note and held Rio Grande liable for the outstanding balance on it, $358,297.90;

2. Transferred the 465 notes back to Rio Grande;

3. Held that a merger of title had occurred with Orange holding both fee title and first liens on the nine properties, and declaring that Rio Grande's liens on those properties were elevated to first lien status to secure the return of the 465 loans held by Orange.

Judgment was entered against Piperi for actual and punitive damages, but a take nothing judgment was entered in favor of Rio Grande against Orange Service Co. Neither Piperi nor Orange Service Co. are parties to this appeal.

## II. VALIDITY OF CLAIMS AND DEFENSES

By points 1 through 4, 13, 15 and 16, First Heights contends that no evidence supports the jury's finding that Rio Grande established its defense of repayment on the $20 million note vis-a-vis its "loans" to the buyers of the nine properties, as no evidence showed that Orange benefitted from the transaction. First Heights also maintains that it established its counterclaim for full payment on the note and that all defenses brought by Rio Grande were barred for a variety of reasons. In particular, appellant asserts that the *D'Oench Duhme* Doctrine applies to bar all claims and defenses against it. First Heights also contends that under Federal and State law it is not subject to those liabilities of First Savings Association of Orange at issue here because it did not expressly assume them.

### THE CHARGE AND THE EVIDENCE

When answering the first three questions put to it, the jury found (1) that Orange's loan to Rio Grande and Rio Grande's loans for the nine properties were one transaction that passed through Rio Grande for the benefit of Orange, (2) that the nine loans were a repayment of the $15 million loan to Rio Grande, and (3) that Orange was the owner of the nine properties as a result of the transaction. These findings indicate that the jury looked at the transactions as a whole, finding that Orange was loaning money to itself to increase its perceived profits and to artificially bolster its financial standing.

First Heights attacks these separate findings by several points of error. By its fourth point of error it complains that no evidence existed to establish a defense of payment, in particular, that neither Rio Grande nor Orange intended that the loans on the nine properties would be a repayment of the $15 million contemporaneous note made by Rio Grande. First Heights also contends that the special issue submitted to the jury failed to contain the requisite element of intent. Appellees respond that equity should be applied to give effect

to the true nature of the transactions rather than strictly applying legal principles.

■ Payment is defined as the discharge of an obligation by the actual or constructive delivery of money or its equivalent by the obligor or by someone for him for the purpose of extinguishing the obligation, wholly or partially, and the acceptance of it by the obligee. *See Gillman v. Phillips Petroleum Co.*, 601 S.W.2d 513, 515 (Tex. Civ.App.—Amarillo 1980, no writ) (citing 60 AM. JUR.2d *Payment* § 1 (1972)); *Tharpe v. Schmall*, 44 S.W.2d 505, 506 (Tex.Civ. App.—Dallas 1931, no writ); *Rampy v. Nance*, 286 S.W. 294, 295 (Tex.Civ.App.— Texarkana 1926, writ dism'd w.o.j.). We do not find the defense applicable here, as the series of loans at issue was found to be a circular transaction.

Appellant is correct that no evidence exists of an intent by either party to repay; however, the legal doctrine of payment, with its constituent elements, was not the question asked of the jury nor is it the theory relied on by Rio Grande. The equitable theory presented by Rio Grande, and the conclusion of the jury's findings, is that the loan to Rio Grande was part of a larger circular transaction and, in effect, was a sham. This conclusion must be given effect. That there is no evidence of the intent of the parties under the doctrine of payment is not dispositive.

■ Several historical maxims on which equity is premised require discussion here. Equity is a court of conscience. *Davis v. Carothers*, 335 S.W.2d 631, 641 (Tex.Civ.App.—Waco 1960, writ dism'd) (opinion on reh'g). It assumes jurisdiction when the legal remedy is not as complete as, less effective than, or less satisfactory than the equitable remedy. 30A C.J.S. *Eq-*

*uity* § 24a (1992). Equity is based upon the avoidance of irreparable injury. *Gulf Oil Corp. v. Walton*, 317 S.W.2d 260, 263 (Tex.Civ.App.—El Paso 1958, no writ). Moreover, it seeks to prevent unjust enrichment,[8] and in particular, abhors that unjust enrichment which comes from a double satisfaction of an obligation.[9] Equity seeks to do justice,[10] to strike a balance by reviewing the entire situation. 30A C.J.S. *Equity* § 94 (1992). Equity acts in accordance with conscience and good faith and promotes fair dealing; it will not further an improper objective which is likely to cause a detriment to the other party. 30A C.J.S. *Equity* § 94.

■ Equally important, equity regards that as done that ought to be done.[11] Consequently, it emphasizes substance over form.[12] It "imputes an intention to fulfill an obligation." 30A C.J.S. *Equity* § 124 (1992). With regard to the applicability of equitable principles to a payment defense, when a debtor pays money to its creditor, a presumption of repayment is created unless it is shown that the payment was consistent with the continued existence of the debt. 70 C.J.S. *Payment* § 72b (1987). "The fact that the creditor has money in his hands belonging to the debtor tends to raise the presumption of payment which is stronger with corroborating circumstances." 70 C.J.S. *Payment* § 72b.

■ The evidence in this case reflects that as a direct result of the $15 million Rio Grande funded for the down payment on the nine properties, Orange's wholly-owned subsidiary, Orange Services Company, received 75% of that amount in profits participation, and another of Orange's subsidiaries, National Title Company, received $1 million for effectuating the sale. The sell-

---

8. *City of Houston v. Howe & Wise*, 373 S.W.2d 781, 789 (Tex.Civ.App.—Houston [1st Dist.] 1963, writ ref'd n.r.e.).

9. 30A C.J.S. *Equity* § 93.

10. *Dews v. Floyd*, 413 S.W.2d 800, 806 (Tex.Civ. App.—Tyler 1967, no writ); *Howe & Wise*, 373 S.W.2d at 789.

11. *King Land & Cattle Corp. v. Fikes*, 414 S.W.2d 521, 524 (Tex.Civ.App.—Fort Worth 1967, writ ref'd n.r.e.); *White v. Hancock*, 238 S.W.2d 801,

803 (Tex.Civ.App.—Fort Worth 1951, no writ); *Sanderson v. Sanderson*, 109 S.W.2d 744, 748 (Tex.Comm.App.1937, no writ).

12. *Fikes*, 414 S.W.2d at 524; *Barr v. Thompson*, 350 S.W.2d 36, 42 (Tex.Civ.App.—Dallas 1961, no writ); *Texas Employers' Ass'n v. Cashion*, 130 S.W.2d 1112, 1113 (Tex.Civ.App.—Dallas 1939, writ ref'd).

ers of the properties placed the 25% profits they received into an escrow account in Orange's favor. Orange reaped all of the benefits from the transfer of its loan money to Rio Grande when Rio Grande wired that money into the National Title account.

The substance of the transaction clearly shows that the new buyers never saw the money Rio Grande purportedly was "loaning" to them; Orange received it directly in the form of profits for its subsidiaries and an escrow account for itself. Equity requires to be done what should be done. To allow First Heights to now enforce this note for payment of the full $20 million would result in the double satisfaction of the obligation to repay the loan. Equity abhors such a result.

Reviewing the circumstances surrounding the entire transaction and giving weight to substance over form as equity requires, the trial court did not err by refusing to submit the issue of intent to the jury in either a special question or an instruction. The application of equitable principles was found in the court's proper broad-form submission to the jury, asking only whether Rio Grande's "loans" to the new buyers constituted a repayment of Orange's loan to it. The evidence supports the jury's finding that they were. Points 1 through 4, 13, and portions of 15 and 16 are overruled.

### D'OENCH DUHME

The *D'Oench Duhme* doctrine originated in the case of *D'Oench Duhme & Co., Inc. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).[13] When an institution such as Rio Grande or First Savings Association of Orange fails, the bank is audited by a regulatory agency and then placed into receivership. The receiver for that entity attempts to account for all assets the bank claims to own, including outstanding loans. Oftentimes, the borrower asserts a claim or defense against the receiver's claim for payment of the asset, contending that an oral, undocumented agreement was made between the now-failed institution and the borrower at the time of the loan

transaction. In *D'Oench*, when the FDIC requested payment on a note held by the failed institution, the borrower asserted the defense that the bank promised him he would not be liable on the note. However, this agreement was not in the loan files. The Supreme Court held that borrowers must be estopped from asserting claims and defenses against the FDIC on the basis of such oral, undocumented agreements.

The rationale for such a rule lies in the need for regulators to be able to review a bank's loan files and immediately ascertain the true financial position of that bank, while at the same time requiring financial institutions to employ sound lending practices. *Langley v. FDIC*, 484 U.S. 86, 91–92, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987); *Bowen v. FDIC*, 915 F.2d 1013, 1016 (5th Cir.1990); *FSLIC v. T.F. Stone–Liberty Land Assoc.*, 787 S.W.2d 475, 490 (Tex.App.—Dallas 1990, writ dism'd). When a bank purportedly makes loans to borrowers, evidenced by promissory notes listed as assets on its financial statements, then orally represents that the borrowers will not be required to pay those funds back, the loan files by themselves deceive the regulators into believing the bank's assets are actually much more valuable than they are. "It is the 'evil tendency' of the acts to contravene the policy governing banking transactions which lies at the root of the rule." *D'Oench*, 315 U.S. at 459, 62 S.Ct. at 680 (citing *Deitrick v. Greaney*, 309 U.S. 190, 198, 60 S.Ct. 480, 484, 84 L.Ed. 694 (1940)). The Court held, "the test is whether the note was designed to deceive the creditors of the public authority, or would tend to have that effect." *D'Oench*, 315 U.S. at 460, 62 S.Ct. at 681. The borrower's knowledge of, or even participation in, the wrongdoing is irrelevant. The *D'Oench* Court held,

> Though petitioner [the party asserting no liability on the note] was not a participant in this particular transaction and ... was ignorant of it, nevertheless it was responsible for the creation of the false status of the note in the hands of

---

**13.** *D'Oench* was later codified by 12 U.S.C. § 1823(e).

the bank. It therefore cannot be heard to assert that the federal policy to protect respondent [FDIC] against such fraudulent practices should not bar its defense to the note.

*D'Oench,* 315 U.S. at 461, 62 S.Ct. at 681.

*D'Oench* extends its application to protect FDIC and FSLIC transferees such as First Heights as well.[14]

■ In light of the rationale behind the doctrine, however, it does not apply to bar all claims against the FDIC or its transferee with regard to, or defenses to the FDIC's claims for, payment on outstanding promissory notes,[15] as the doctrine does not apply to claims and defenses that do not depend on secret, undocumented agreements.[16]

■ In particular, *D'Oench* and 12 U.S.C. § 1823(e) do not bar proof that a note has been repaid in whole or in part. *State Nat'l Bank v. Tittle,* 143 Tex. 235, 183 S.W.2d 720, 723 (1944); *Cockrell v. Republic Mortgage Ins. Co.,* 817 S.W.2d 106, 115 (Tex.App.—Dallas 1991, no writ); *FDIC v. State Bank of Virden,* 893 F.2d 139, 143 (7th Cir.1990). Logically, a repayment defense does not depend upon an undocumented, secret agreement between the parties, which is the type of fraudulent arrangement *D'Oench* condemns. In *Virden,* the Court stated with regard to setoffs, a form of repayment,

> it is hard to think of a set-off as an 'agreement' of any kind. . . . If Virden had paid the obligation in full, the FDIC could not say that it was hiding behind an unwritten 'agreement to accept payment.' Setoffs are honored by virtue of trade custom and common law; rules of law recognizing particular ways to satis-

fy a debt are not 'agreements' within the meaning of § 1823(e).

*Virden,* 893 F.2d at 143. Moreover, in *Tittle* and *Cockrell,* the Courts held that payment could be proven by parol evidence and/or by loan records and documentation. *Tittle,* 183 S.W.2d at 723; *Cockrell,* 817 S.W.2d at 112, 115.

■ In this case, the jury found that this entire loan transaction was documented in Orange's loan files. The wire transfers totalling $15.4 million dollars from Orange to Rio Grande were included, as well as the two same-day transfers from Rio Grande into an account at Orange totalling $15.1 million. That account held the $10 million profit participation of one of Orange's wholly-owned subsidiaries, Orange Service Company, as well as a $1 million brokerage fee to another Orange subsidiary and $3 million in escrow for the direct benefit of Orange. The circular flow of the funds was self-evident in the record; the money Orange lent to Rio Grande was immediately returned and repaid to it. No outside agreement was necessary to show this repayment defense; accordingly, *D'Oench* does not apply to bar it.

Appellant maintains by points 15 and 16 that the jury improperly concluded that a "reasonably prudent loan examiner" could find the repayment of this loan in Orange's loan files. As discussed, documented agreements are admissible under *D'Oench.*

First Heights first asserts that the "reasonably prudent loan examiner" standard used in the jury question was an improper legal standard.[17] Appellant contends that *D'Oench* provides a bright-line test for determining agreements enforceable against the FDIC or its transferee, and that what a bank examiner could have found is not dispositive.

---

**14.** *Porras v. Petroplex Savs. Ass'n,* 903 F.2d 379, 380–81 (5th Cir.1990); *Bell & Murphy and Assoc., Inc. v. Interfirst Bank Gateway, N.A.,* 894 F.2d 750, 754–55 (5th Cir.1990), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990).

**15.** *See Buchanan v. FSLIC,* 935 F.2d 83, 85 (5th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991); *FDIC v. McClanahan,* 795 F.2d 512, 515 (5th Cir.1986).

**16.** *Garrett v. Commonwealth Mortgage Corp.,* 938 F.2d 591, 595 (5th Cir.1991).

**17.** Question 4 reads, in pertinent part,

> Would a reasonably prudent loan examiner who was examining the loan files of Orange have concluded that the facts you have found in answering "Yes" as to Question One, Two or Three were shown by the loan files of Orange?

However, the reasonably prudent bank examiner standard was applied recently in *Fair v. NCNB Texas Nat'l Bank*, 733 F.Supp. 1099, 1105 (N.D.Tex.1990). In that case, the borrowers pleaded a defense that the bank defrauded them into participating in a worthless development loan transaction by using a false appraisal and false construction specifications. The borrowers asserted that because the appraisal and construction specifications were located in the bank's loan files, the fraudulent agreement was evident to bank loan examiners and the *D'Oench* doctrine did not bar the introduction of those documents or their defense. However, the Court held the presence of an appraisal and construction specifications in the Bank's files would not lead *a reasonably prudent bank examiner* to conclude that the bank defrauded its borrower. *Fair*, 733 F.Supp. at 1105 (emphasis added). The *D'Oench* doctrine therefore applied to bar the borrower's fraud defense. *Id.*

▮ The *D'Oench* doctrine bars a defense to a suit on a note unless there is some documentary evidence in the creditor's file that substantiates the debtor's claim that the note has been paid or that an agreement pertaining to the collection of the note has been made. If this evidence exists in the file, the issue becomes whether that evidence is sufficient to put the successor institution on notice. That question is resolved by inquiring whether a reasonably prudent bank examiner would have concluded from an examination of the file that the defense to the note existed.

The standard enunciated in Jury Question 4 was proper.

▮ First Heights also maintains that the instruction regarding the documents found in the "loan files of Orange" was overbroad, containing types of documents not found solely in loan files, such as correspondence letters.[18] First Heights maintains that *D'Oench* defines relevant loan documents as "official bank records that set forth the rights and obligations of the bank and those to whom the bank lends money",[19] such as promissory notes, guarantees, deeds of trust, and other formal documents evidencing the loan transaction. However, the *D'Oench* test is whether the agreements are "clearly evidenced *in the bank's records*" and "apparent to bank examiners." If they are not, no claim or defense may be founded on them against the FDIC. *Fair*, 733 F.Supp. at 1105 (quoting *Bell & Murphy*, 894 F.2d at 754) (emphasis added). Routine bank records and executive committee minutes are official bank records for purposes of *D'Oench*,[20] as are appraisals, construction specifications, and all writings contained in the loan file.[21]

▮ The documents that evidenced repayment and Orange's direct benefit from this loan transaction were the promissory notes, the two wire transfers to Rio Grande from Orange, and the two wire transfers back to the National Title account for the benefit of Orange Service Co. and National Title, Orange's subsidiaries. These writings are of the ordinary type contained in loan files. We hold the instruction was not improper.

---

**18.** The remainder of Question 4 reads,

> For purposes of this question, you are instructed that the "loan files of Orange" are those documents which
> (1) were created or obtained by Orange in the ordinary course of its lending activities during the period of the June 30, 1986 transaction, and
> (2) were maintained in the loan files on which Orange relied for its business activities with respect to the loans and properties at issue in this case, and
> (3) remained continuously in Orange's files up to and including September 23, 1988, when Heights acquired those files, and

> (4) were available for examination by savings and loan examiners.
> You are not to consider in answering this question any testimony or evidence other than documents which you conclude from all the circumstances were actually in the loan files of Orange.

**19.** *Stiles v. RTC*, 831 S.W.2d 24, 28 (Tex.App.—Dallas 1992, writ pending); *T.F. Stone*, 787 S.W.2d at 490.

**20.** *Beighley v. FDIC*, 868 F.2d 776, 783 n. 11 (5th Cir.1989).

**21.** *Fair*, 733 F.Supp. at 1105.

First Heights also contends that Rio Grande produced no evidence that the documents relied upon by the jury were contained in Orange's files during the relevant loan period, June 30, 1986. This contention is discussed fully later with regard to point of error 36 and is without merit. Point 1 and portions of 15 and 16 are overruled.

## ASSUMPTION OF LIABILITIES

■ By point 2, First Heights contends that it only assumed two classes of Orange's liabilities: those of its depositors and its secured creditors. Appellant maintains that because it did not expressly assume the liabilities of Orange's unsecured creditors, both Texas and Federal law preclude Rio Grande's claims of liability against First Heights. We disagree.

The trial court's judgment favored First Heights's counterclaim for payment on the $20 million note by upholding the validity of the note and requiring payment on the balance. This note constituted an *asset acquired by* First Heights rather than a liability assumed by it. Moreover, because the jury found, and the judgment reflected, that only Piperi was liable for fraud and wrongdoing, First Heights is saddled with no liability in this case. This appeal centers on the validity of Rio Grande's repayment defense to First Heights's claim for payment on an outstanding note acquired as an asset by First Heights. First Heights was held liable for nothing more than attorney's fees in the trial court below. Point 2 is overruled.

## MERGER OF TITLE AND EQUITABLE SUBORDINATION

■ By points 6, 10, 14, and the remaining portions of 15 and 16, appellant contends that the court erred by rendering judgment in favor of Rio Grande and Gutierrez on their merger of title and equitable subordination claims. We note initially that equitable subordination is not a claim but a remedy, and in this case it was imposed only temporarily for the limited purpose of ensuring the return of Rio Grande's collateral. So long as the trial court's judgment is obeyed, this entire transaction will effectively vanish, with each party reacquiring the properties they possessed prior to June 30, 1986. The court's imposition of equitable subordination is, for all intents and purposes, moot, as we presume the parties will comply with that court's judgment as well as our own.

Nevertheless, equitable subordination is often grounded upon a finding that the lienholder on a piece of property, through its inequitable conduct, conferred an unfair advantage to itself at the expense of subordinate lienholders. *See Matter of Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir. 1977) (bankruptcy case); *Allied Bank of Texas v. Plaza DeVille Assoc.*, 733 S.W.2d 566, 571 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.) (non-bankruptcy case); *Continental Radio Co., Inc. v. Continental Bank & Trust Co.*, 369 S.W.2d 359, 361 (Tex.Civ.App.—Houston [1st Dist.] 1963, writ ref'd n.r.e.). "[A] prior lien gives a prior claim ... unless the lien be ... displaced by some act of the party holding it, which shall postpone him in a court of law or equity to a subsequent claimant." *Rankin v. Scott*, 25 U.S. 177, 179, 6 L.Ed. 592 (1827).

Here, the trial court granted primary lienholder status to Rio Grande in the nine properties on which it originally held secondary status, doing so in order to ensure that First Heights would return the 465 real estate loans Rio Grande pledged to it as collateral on the $20 million note. Because the court found the note to have been almost completely paid-off, requiring Rio Grande to pay the meager balance plus interest, the court rendered the note paid and required the return of the collateral securing it.

Appellant maintains that Rio Grande failed to request a jury question or obtain an answer to a jury question that established an equitable subordination claim, that the claim is barred by *D'Oench Duhme*, and that First Heights did not expressly assume all of Orange's liabilities. We find that the crux of the court's imposition of equitable subordination was Orange's surreptitious acquisition of both fee title and primary lien status on the nine

properties. Consequently, so long as the question regarding merger of title and those questions underlying it were properly asked and answered, equitable subordination was proper.

## OWNERSHIP INSTRUCTION

■■■ The jury found that Orange owned the nine properties on which it held first liens. On this basis, the trial court found a merger of title. Appellant maintains, however, that no evidence supported the jury's finding that Orange owned those properties, and more specifically that a finding that such ownership could be found in Orange's loan files was improper.

By point 14, appellant contends that the ownership instruction given to the jury was overbroad and contained irrelevant examples of incidents of ownership. The instruction read:

> You are instructed that, in determining whether Orange is the owner of a property, you may consider whether Orange enjoyed or exercised the incidents of ownership of the property. Incidents of ownership include: legal title; possession; exercising control and dominion over property; enjoyment of rents and revenues from property; having the risk of loss or potential for gain with respect to property; and making payments for maintenance, property taxes and insurance.

First Heights urged below and contends on appeal that possession of legal title is the only criterion of ownership and that it is undisputed that the new buyers held that title. Therefore, the instruction erroneously provided the jury with the ability to find that First Heights owned the properties. We disagree.

Just as with the repayment instruction, because of the surreptitious and circular nature of this transaction, we apply equitable principles to prevent unjust enrichment on First Heights's behalf. Equity looks to substance over form, and the letter of the transaction must not shadow the true nature and effect of it. After reviewing the record, we find that it contains an abundant amount of evidence from which the

jury could find that First Heights, for all intents and purposes, was the undisputed owner of the nine properties.

## EVIDENCE OF OWNERSHIP

The purported buyers of the nine properties testified at trial. The first, Walter Sutter, stated that he was involved in the purchase of the Somerset apartment complex in Kentucky, which cost $2 million. He said that he knew nothing about the property before he signed the closing papers, relying solely on Piperi's representations that the title to the property was good. His total income for the year 1986 was only $21,000, and he paid no money of his own to purchase this property. Sutter has paid for none of the expenses incurred, has received no income from the property, never paid taxes on it, and never paid on the Rio Grande loan. When he was sued in connection with the property, Piperi reimbursed the $10,000 in attorney's fees charged against him. Even more important, shortly after this transaction, Piperi paid Sutter and his wife $20,000 "to use however they wanted."

Sutter's wife Mary verified her husband's testimony, adding that when the couple received tax bills for the property, she sent them directly to Piperi and Orange. The couple never dealt directly with the government regarding taxes. Mary Sutter asked Piperi if he paid the property tax bills, but she did not actually know whether he was the one who paid them. She does know that Piperi sent her documents showing that the property taxes had been paid. Sutter also stated that all financial inquiries were sent to Piperi. Finally, she knows that several of the buyers of these nine properties were relatives and friends of Piperi's.

The Loves, another couple involved in the purchase of the nine properties, reiterated everything the Sutters said. Mr. Love testified that Piperi paid their legal fees when they were involved in a lawsuit on the properties, and they, too received a $20,000 check from Piperi after the transaction was completed. Mr. Love also testified that he

assumed they sent their property tax bills directly to Piperi.

Mrs. Love stated that she'd worked as Piperi's law firm secretary in the past and was a childhood friend of Piperi's daughter. She and her husband had sold their house, earning $40–$50,000, so she called Piperi to ask how they should invest the money. Piperi contacted her later to suggest she invest in some Kentucky property. When preparing to enter this transaction, she signed a financial statement in blank, and Orange filled it in for her. She later learned that Orange included as her assets properties which in fact were owned by her mother. Mrs. Love testified that she and her husband knew nothing about the property or investments, and never paid any of their own money for the property. All property tax bills were sent directly to Piperi and Orange, as was a notice sent that the builder's risk insurance on the property was being canceled. The Loves, too, received $20,000 from Piperi after the transaction was completed. Finally, Mrs. Love was able to identify several of the other investors in the nine properties: one was a friend of Piperi's son, one couple were Piperi's aunt and uncle, and the wife of one of the investors was a longtime friend of Piperi's wife.

Jeffery Lagow, a commercial property developer, testified that he approached Piperi in the early 1980's to enter into a joint venture on several apartment projects and bond transactions. Orange loaned him the money necessary, taking a 50% profit participation at first, then a 75% portion. All of those properties were sold, at Orange's request, in the June 30, 1986 transaction at issue here. Orange advanced the money to buy the land underlying the properties; if Lagow owned any of that land, Orange was supposed to give him a loan reimbursing him for what he'd paid for that property. He stated that Orange never released those loan funds to him.

Lagow testified that Orange's management always made the ownership decisions on the nine properties. He said that Shelby Smith, Chairman of the Board at Orange, made decisions that normal lenders do not make; all reports were sent to Orange, and all communications concerning the properties were made to Orange. Lagow also noted with interest that all of the loans advanced to the buyers of the properties were non-recourse loans; that is, these borrowers could walk away from the loans at any time. In addition, the fact that the sale of these properties was 100% financed was unusual. Lagow testified that he assumed Orange was the true owner of all of the properties. Moreover, when Orange contended that it was only a first lienholder on the properties, Lagow stated that this was a "new and unique position."

First Heights argues that it did not own these properties, and therefore no merger of title resulted and equitable subordination was erroneously imposed. Equity looks to substance over form, and the letter of the transaction must not shadow the true nature and effect of it. On the basis of the complete lack of involvement of the buyers in this transaction and in the properties, and Orange's management's exercise of its full decision-making abilities, the jury could find equitable incidents of ownership. Moreover, all tax demands were sent directly to Orange, as were notices of insurance cancellation; when the investors were sued on the properties, Orange paid their attorney's fees. Orange supplied all of the money for the purchase of these properties, and did so in non-recourse loans for which the buyers would not be responsible. If the properties did not generate enough income to pay the loans granted by Orange, Orange had an escrow account from which deficient loan payments would be made. Orange generated revenues and paid expenses on these properties. Moreover, the fact that all of the buyers were friends or relatives of Piperi's with minimal yearly net incomes and no investment experience, and because they all received checks for $20,000 shortly after the transaction was complete, showed some evidence from which the jury could find the "investors" did not buy these properties, but that Orange did. Lagow's testimony that Orange was the owner was equally probative and could support the jury's finding.

The jury properly found evidence of ownership with guidance from an instruction which gave credence to equitable principles and focused on the substance of the transaction rather than its strict form. This avoided the potential unjust enrichment First Heights would have gained otherwise, which equity abhors.

## EVIDENCE OF OWNERSHIP IN ORANGE'S LOAN FILES

Appellant further maintains that this determination of ownership was not evidenced in Orange's loan files, as the jury found. A chain of documents in those files, admitted into evidence, demonstrates that Orange was in fact the owner of the nine properties here, therefore making merger of title appropriate. These documents, all signed and executed on the same date, that of this loan transaction, June 30, 1986, are as follows:

1. *Deed* from Somerset Place I, a limited partnership, to the Sutters for the Kentucky property they purchased. Price: $2 million, ostensibly borrowed from Rio Grande. **NOTE:** Orange is designated as the owner of 100% of the outstanding bonds Somerset obtained to finance the development of the property originally. **ALSO NOTE:** The bonds are secured by a mortgage on the property.

2. *Exoneration Statement and Investment Letter* The Sutters bought the bonds from Orange for $8 million.

3. *Promissory Note* The Sutters borrowed the $8 million to buy the bonds **FROM ORANGE.**

4. *Pledge Agreement* The Sutters pledge the bonds with Orange as security to ensure payment on the new $8 million note.

5. *Bond Purchase Option Contract* Orange buys from the Sutters the option to purchase all of the bonds in the event the Sutters attempt to sell them to another.

The records also included financial statements from the Sutters, showing that Mr. Sutter earned only $21,000 in 1986. The Sutters clearly could not make the payments on the $8 million bond note from their personal funds. The record also reflects that the property could not generate enough income to pay off the loan either. The Sutters would inevitably default on the note, and Orange would soon acquire the bond, the collateral on that note. The Sutters, as the owners of the property, would then owe Orange $8 million on the bond. Because the bond could not be paid for the same reasons the loan could not be, Orange would foreclose on that property.

Similarly, Orange's June 30, 1986, Loan Summaries show that many of the individual investors who purchased the nine properties here also borrowed funds from Orange to purchase the bonds that financed those properties, with the bonds themselves as collateral on those loans. In the alternative, Orange itself owned the bonds on some of the properties outright, the bonds secured by deeds of trust on the properties.

Due to the documented financial positions of the individual investors and these properties, Orange clearly held the inevitable position of owning the properties, although it took great pains to avoid the appearance of such a result. The jury properly found that Orange's ownership of these properties was documented in Orange's loan files.

## MERGER INSTRUCTION WAS PROPER

The remedy of equitable subordination is appropriate in situations where a merger of title has occurred. The doctrine of merger is based on six elements: 1) the existence of a greater and lesser estate; 2) both estates must unite in the same owner; 3) both estates must be owned in the same right; 4) no intervening estate must exist; 5) merger must not be contrary to the intention of the owner of the two estates; and 6) merger must not be disadvantageous to the owner of the two estates. *Flag–Redfern Oil Co. v. Humble Exploration Co.*, 744 S.W.2d 6, 9 (Tex.1987).

Having found ownership, merger of title must necessarily result. Appellant maintains, however, that if we are to agree with the jury, we must strictly apply the *Flag–Redfern* merger test, considering the final two elements: whether the owner intended

this merger and whether the merger is advantageous to the owner of the two estates. Appellant complains that it did not intend this disadvantageous result, and therefore the merger test has not been met.

A review of the facts of this case makes clear, as the jury found, that the entire transaction at issue here was executed at the insistence of, and for the benefit of, First Savings Association of Orange. Throughout the transaction, Orange surreptitiously attempted to mask its true nature; it did so at the trial court level and continues to do so on appeal. The jury and trial court applied equitable principles to acknowledge the substance of the transaction and to disregard its form. Orange attempted to skirt the law in 1986, yet First Heights now contends that we should apply those same laws to protect it. Merging the two estates is clearly contrary to the intentions of First Heights, as it was contrary to Orange's intentions, and it is disadvantageous to appellant as well. However,

> Equity will never allow a merger to be prevented ... when this result would aid in carrying a fraud or other unconscientious wrong into effect, under the color of legal forms.

3 S. Symons, *Pomeroy's Equity Jurisprudence* § 794 (5th ed. 1941). Points 6, 14, and the remaining portions of 15 and 16 are overruled.

## EQUITABLE SUBORDINATION

Having found equitable subordination was properly applied in this case, we address, for the sake of completeness, final counter-arguments posed by First Heights on the matter. First Heights asserts that the "claim" of equitable subordination is barred by the *D'Oench Duhme* Doctrine. The contention is without merit as equitable subordination is a remedy and not a claim. Nevertheless, the loan records clearly reflect the appropriateness of the merger and the necessity for equitable subordination. Appellant's final objection to the "claim," that it did not assume all of Orange's liabilities but only those of its depositors and its secured creditors, is inapplicable here. This equitable remedy mere-

ly acknowledges that Orange owned, as assets, both fee title and primary lien status on all nine properties. Given the fraudulent transactions that are evidenced in the loan files, equity requires that these assets be merged. The court properly granted equitable subordination to ensure the return of 465 real estate liens Rio Grande pledged as collateral on the repaid $20 million note, also one of Orange's assets. The assumption of Orange's liabilities has no applicability to this asset-related remedy. Point 10 is overruled.

## JURY CHARGE INCONSISTENCIES

Appellant maintains by points 23 and 24 that the jury's answers to two sets of questions were fatally inconsistent, and therefore these answers must be disregarded. The jury found in answer to Question 2 that the nine loans Rio Grande made to the new buyers were a repayment of the $20 million loan Orange made to Rio Grande. In Question 5, the jury was asked whether the nine second liens Rio Grande received as security for its "loans" to the new buyers were therefore ultimately given in exchange for the 465 loans it pledged to Orange as security on the now substantially repaid $20 million note. The jury was also asked whether Rio Grande did not then receive fair consideration for the pledge of the 465 loans. The jury answered the questions affirmatively.

Appellant urges on appeal that the jury found in Question 5 that the nine *loans* Rio Grande extended to the new buyers were the consideration for Rio Grande's pledge of its 465 loans to Orange. Therefore, appellant maintains that if the nine loans repaid the $20 million note, they could not also have been used as consideration for the pledge of the 465 loans.

Question 5 is the logical extension of Question 2. The nine loans and the collateral given to secure them are two separate assets. The jury found that Rio Grande repaid the note and returned Orange's money via the making of nine loans solely for the benefit of Orange. The jury then found that the economic result and true

effect of this transaction was that Rio Grande in essence exchanged its 465 loans, the security pledged on the repaid note, for 9 second lien notes, the security given on the nine loans. The jury did not find that Rio Grande paid $15.1 million in exchange for pledging its own 465 loans. The findings are not conflicting.

■ Appellant also maintains that the jury's answer to Question 2, finding repayment, is fatally inconsistent with its findings in Questions 7 and 8 that Rio Grande was defrauded and suffered actual damages as a result. Appellant contends that if the jury found that the note was repaid, it suffered no damages, and damages are an element of a finding of fraud.

Repayment and fraud were grounded on both Rio Grande's payment on the $20 million note and Orange's failure to return the 465 loans pledged as collateral. Because the jury found repayment and the 465 properties had not been returned as of the time of trial, the jury was asked whether they found Orange and Piperi liable for fraud. After an affirmative finding, Question 8 asked,

> What sum of money, if any, if paid *now* in cash by *Piperi* would compensate Rio Grande for its actual losses as a result of the actions of *Piperi* ...?

(emphasis added). The jury found the value of the 465 properties to be $21 million and imposed this as the actual damages Rio Grande sustained as a result of entering the transaction.

The intertwining nature of the fraud and repayment allegations and findings is evident in the final judgment, which allows that "both Heights and Piperi [are] entitled to credit against the obligations of each for any payments made by the other in satisfaction of this judgment...."[22] That is, if First Heights returns the 465 loans, Piperi will no longer be liable for actual damages, or if Piperi pays a portion of his actual fraud damages, First Heights may retain a portion of the 465 loans of equal value. Points 23 and 24 are overruled.

### III. PROCEDURE

#### MOTIONS

By points 31 through 33, appellant complains of several procedural decisions made by the trial court, all of which concerned the joinder of parties. The court denied First Heights's motion for a separate trial, did not grant judgment *nihil dicit* in favor of Rio Grande against Piperi when Piperi withdrew his answer immediately before trial, and did not grant a mistrial when, several days after the trial had begun, Rio Grande and its former directors, also defendants in the case, announced that they had settled. In essence, First Heights contends that it should not have been forced to defend this lawsuit alongside both the former directors of Rio Grande, who directed the blame and liability for the fraud to Piperi, and Piperi himself, who invoked his privilege against self-incrimination and would not answer questions regarding the transaction at issue. Appellant asserts that because all of these parties were forced to try this suit together, highly prejudicial information was presented to the jury that would have been inadmissible against First Heights alone.

■ The trial court has great discretion with regard to the manner in which a trial is conducted. *Schroeder v. Brandon,* 172 S.W.2d 488, 491 (Tex.1943); *Clark v. Turner,* 505 S.W.2d 941, 945 (Tex.Civ. App.—Amarillo 1974, no writ); *Hearn v. Ellis,* 504 S.W.2d 518, 520–21 (Tex.Civ. App.—Beaumont 1973, writ ref'd n.r.e.). No judgment shall be reversed on appeal on the ground that the trial court committed an error of law unless we find that the error so denied the rights of the appellant that it was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. Tex.R.App.P. 81(b)(1). The trial court entered judgment *in favor of* First Heights to the extent that it upheld the validity of the $20 million note executed in its favor by Rio Grande, disregarding any findings by the jury that the transaction constituted a fraudulent conveyance or that the note was therefore illegal. The

---

**22.** The judgment notes that the $63 million punitive damages levied against Piperi will not be credited by any payments or property returns made by First Heights.

court and jury found that the note had been substantially repaid, but did hold Rio Grande liable for the balance on the note, $358,297.90, plus interest. The jury expressly found this repayment was evidenced by Orange's loan files, after having been instructed that when answering that question they were not to consider any testimony or evidence other than the documents they concluded were actually in those loan files. All findings of fraud and judgments thereon held only Piperi liable; the jury was expressly instructed to disregard any monies for which Orange might be liable as an incidence of fraud.

Appellant brings to our attention only two specific incidents in which purportedly prejudicial information was presented to the jury. During voir dire, one of the attorneys noted that Orange made a criminal referral against Piperi. During trial, Piperi's videotaped deposition was played, during which he invoked his privilege against self-incrimination. Neither of these pieces of information were dispositive of the jury's finding that Orange's records evidenced a repayment of this note, and they cannot be said to have affected the outcome of this case as it pertained to First Heights. In fact, the jury was expressly instructed that Piperi's pleading the Fifth Amendment was to be considered irrelevant in relation to any party except Piperi himself.

Moreover, the inclusion of any other evidence tending to implicate Piperi, which may have prejudiced the jury's findings against Orange (ultimately First Heights) on all issues except repayment (such as fraudulent conveyance and fraud) was remedied by the trial court's judgment. The trial court disregarded the jury's findings against Orange on all issues except those which could be determined merely from viewing Orange's records (repayment, ownership, and the circularity of the transaction). Points 31 through 33 are overruled.

### EVIDENCE

By point 34, the appellant contends that the trial court erred by admitting the videotaped deposition of Piperi, who invoked his privilege against self-incrimination with regard to the transaction at issue. Appellant contends that because Piperi withdrew his answer and was tried *in absentia*, this testimony was wholly inadmissible and highly prejudicial.

 The trial court thoroughly instructed the jury during the charge to disregard the plea of the 5th Amendment as it related to any party except the one asserting the privilege. The court informed the jury that such a plea of privilege against self-incrimination was relevant only against Piperi and no other party. Juries are presumed to follow the instructions given them by the court. Point 34 is overruled.

 By point 36, appellant asserts that the trial court erred by allowing two summaries of Orange's loan files. The summaries showed all aspects of the nine loans transaction, including appraisal values, sources of funding, whether the loans were non-recourse, profits participations, cash flow guarantees, and all other uses of the money loaned. Appellant maintains that the underlying documents on which the summaries were based were unauthenticated and hearsay, and that no evidence showed that these documents were in Orange's loan files at the time of the transaction. Appellant also objected to the admissibility of these summaries pursuant to TEX.R.CIV.EVID. 1006. Appellees respond that the underlying documents were admissible, citing TEX.R.CIV.EVID. 901(a) as the appropriate rule to be applied. Rule 901(a) states,

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Several witnesses testified that these documents were first obtained from Orange itself in response to a request for production when this lawsuit was first filed in 1988, before the institution was closed. Appellant contends that the fact that these

documents were produced by Orange is an admission against Orange only. Appellant maintains that because Orange is not a party to this suit, such an admission cannot be used against First Heights and amounts to nothing more than hearsay.

First Heights entered into an Acquisition and Assumption agreement with the FSLIC, becoming the transferee of the FSLIC's First Savings Association of Orange takeover. First Heights acquired all of Orange's assets and substantially all of its liabilities. Further, former Orange employees became First Heights's employees. First Heights also obtained all of Orange's business files and records, as admitted, stipulating to the FSLIC's knowledge of all of Rio Grande's claims before it took over Orange. First Heights was the FSLIC's *transferee.*

A primary duty of the FDIC and the FSLIC is to pay depositors of failed financial institutions. The preferred method ... is through the use of purchase and assumption agreements. [They] are preferred because they minimize the [FDIC's and FSLIC's] losses, expand the purchasing institution's *opportunities* at low risk, and protect depositors. *D'Oench, Duhme* promotes purchase and assumption transactions by offering the purchaser protection from secret agreements that tend to affect adversely its *rights* in the instruments that it acquires. *Porras,* 903 F.2d at 380–81 (citations omitted) (emphasis added). As Orange's successor in interest, First Heights is suing to enforce its rights, to receive payment of an asset acquired by Orange in 1986. Appellant's hearsay objections to documents written by or to Champion and Orange are without merit.

■ Whether these documents were contained in Orange's files in 1986 and had not been added since that time was also at issue. One of Heights's witnesses, an auditor, testified that he examined Orange's files in August of 1986, and he confirmed that the information found in the summaries was in the loan files at that time. A Federal Home Loan Bank examiner testified that he found the same information in

Orange's files in early 1987. These same documents were found in Heights's files in 1990, in a response to a request for production. The examiner of Heights's files testified that he was told the files were obtained from Orange. We note that Rio Grande's Request for Admissions asked First Heights to admit whether on or about September 23, 1988, Heights took possession of the files and business records of Champion (Orange). The answer was, "admitted." The examiner of First Heights's files brought with him a detailed list of all documents originally produced by Orange in 1988. When reviewing First Heights's files, the examiner noted that the documents in them "by and large were precisely what we already had." The examiner made no copies of documents already received from the Orange document production; any additional documents were copied and given special numbers to differentiate them from the original Orange records on which the summaries were based. Finally, Shirley Glueck, an employee of both Orange and Heights and who was familiar with these files, testified that Heights preserved the integrity of the files it received from Orange. We find that the witnesses' testimony sufficiently authenticated these documents pursuant to TEX.R.CIV.EVID. 901(a). Point 36 is overruled.

■ By point 37, appellant contends that an overwhelming majority of the evidence presented was inadmissible under the *D'Oench Duhme* Doctrine. First Heights maintains that the court allowed evidence of alleged statements, promises, and facts relating to the transaction that were not reflected in Orange's formal loan documents. While this assertion is correct and the trial court did erroneously admit the information, we apply a harmless error analysis to determine if the actions caused the rendition of an improper judgment.

The jury and trial court upheld the validity of the note created by Orange. The repayment of that note was established solely through the loan documents in Orange's possession. With regard to fraud and any other liabilities found on the basis of agreements or evidence outside the loan

documents, the trial court limited that liability to Piperi only. Applying Rule 81(b)(1), the entry of evidence purportedly inadmissible under *D'Oench* did not cause the rendition of an improper judgment. Point 37 is overruled.

By point 39, First Heights contends that the trial court erred when admitting several of appellant's exhibits into evidence. Appellant attempted to admit into evidence four hand-drawn charts, created during trial, that illustrated the nine-loans transaction. The court admitted those exhibits for demonstrative purposes only. Appellee then offered several exhibits that also summarized the nine-loans transaction, and the trial court entered those as evidence for all purposes.

The sole example appellant provides in its brief of an appellee exhibit erroneously admitted as evidence is Plaintiff's Exhibit 3605, a printed summary prepared in advance. The printout, which separates each of the nine properties, denotes the purchasers, the purchase prices, the size of the liens, their appraisal values, and their projected annual net operating incomes. This summary, based upon documents found in Orange's loan files, was properly admitted. Point 39 is overruled.

By point 40, appellant maintains that it is entitled to a new trial pursuant to TEX.R.APP.P. 50(e) because some of its exhibits were lost during trial.[23] Rule 50(e) provides:

> **(e) Lost or Destroyed Record.** When the record or any portion thereof is lost or destroyed it may be substituted in the trial court and when so substituted the record may be prepared and transmitted.... If the appellant has made a timely request for a statement of facts, but the *court reporter's notes and records* have been lost or destroyed without appellant's fault, the appellant is entitled

to a new trial unless the parties agree on the statement of facts. (emphasis added).

First Heights contends that letters reflecting the existence of the Playa Credit (to be discussed later) were lost as were four charts drawn by its attorneys during trial and admitted for demonstrative purposes only. With regard to the impromptu drawings, these were hand-drawn to illustrate a witness's testimony. The witness was explaining several documents that purported to illustrate the letter of the nine-loans transaction. The witness's testimony is fully and accurately reflected in the record; we do not therefore find the drawings merely illustrating that testimony dispositive to our analysis of the case. Their exclusion from the record does not warrant that this case be retried.

With regard to the Playa Credit letters, the appellees attempted to substitute exact duplicates of the documents into the trial court record. The court allowed the substitution. We see no error under Rule 50(e) in the trial court's substituting exact duplicates of printed documentary exhibits into the record, over the losing party's objection, in order to ensure that the record is whole on appeal. Otherwise, when an original cannot be found, the losing party can refuse to agree to the substitution, although an exact duplicate, in order to obtain an automatic new trial. Such an abuse of Rule 50(e) would hinder judicial economy and is not the purpose of the rule. Point of error 40 is overruled.

## IV. VENUE AND JURISDICTION

By its 27th point of error, First Heights contends that the trial court erred by denying its motion to transfer venue because mandatory venue lay in Travis County pursuant to TEX.REV.CIV.STAT.ANN. art. 852a, the Texas Savings and Loan Act.[24]

---

**23.** Appellant concedes that Rio Grande offered to substitute some of those exhibits, but First Heights refused.

**24.** Art. 852a §§ 8.09(d), (e), & (f) read, in pertinent part:

> (d) Each depositor, creditor, or other person asserting any claim of any character

against an association in the process of liquidation under this section shall ... present his claim in writing to the ... liquidating agent, at such address which has been designated in the notice [to present and prove their claims].... Such claims shall state the facts on which same are based; shall set out any right of priority of payment or other specific

Orange initially filed suit on the notes against Rio Grande and its receiver, Gutierrez, in Orange County on May 9, 1988. Gutierrez filed suit in Cameron County on May 19, 1988, against Orange, Piperi, and former Rio Grande directors at Fincher Investments, among others, seeking a declaratory judgment and an injunction against Orange from foreclosing on the security pledged by Rio Grande.

Orange unsuccessfully moved to transfer venue from Cameron County to Orange County on several grounds, none of which were that mandatory venue existed in Travis County. When First Heights succeeded to Orange's position in the litigation, it filed a counterclaim in the Cameron County action and moved to transfer on the basis of mandatory venue in Travis County.

When a party is substituted for another and is bound by the actions of its predecessor, the venue status of the case will not be affected. *Billings Oil Serv., Inc. v. King*, 636 S.W.2d 727, 728–29 (Tex. App.—Corpus Christi 1982, no writ); *Louis v. Spain*, 330 S.W.2d 478, 480 (Tex.Civ. App.—Eastland 1959, no writ). TEX. R.CIV.P. 86, "Motion to Transfer Venue," sets forth the due order of pleadings. The rule requires that an objection to improper venue is waived if it is not made by written motion filed prior to or concurrently with any other plea, pleading or motion except for a special appearance. Orange, First Heights's predecessor, did not allege that mandatory venue lay in Travis County in its sole motion to transfer venue. Consequently, the motion was overruled and Orange waived its mandatory venue. First Heights, as substitute party for Orange, is bound by Orange's actions and had to litigate this case in Cameron County.

In the alternative, if First Heights is considered a separate and distinct party

that intervened into this lawsuit, it could not have asserted a change of mandatory venue. An intervening party has the status of a plaintiff, and is in no better position than the plaintiff to contest the venue of the action. *Campbell v. Galbreath*, 441 S.W.2d 297 (Tex.Civ.App.—Waco 1969, writ dism'd w.o.j.); 2 McDonald Texas Civil Practice § 6.35 (1992).

Finally, TEX.R.CIV.P. 87(5) provides, in pertinent part,

> **5. Motion for Rehearing.** If venue has been sustained as against a motion to transfer ... then no further motions to transfer shall be considered regardless of whether the movant was a party to the prior proceedings *or was added as a party subsequent to* the venue proceedings, unless the motion to transfer is based on the ... ground of mandatory venue, *provided that such claim was not available to the other movant or movants.*

(emphasis added).

First Heights, if considered a subsequent party, cannot now move for a rehearing to transfer on the ground of mandatory venue because that claim was available to Orange, the movant in the prior transfer proceedings. Point of error 27 is overruled.

By point 28, First Heights posits that the trial court erred by failing to abate the entire cause of action because Travis County maintained exclusive jurisdiction over the case pursuant to the Savings and Loan Act. Appellant cites *Gutierrez v. Lee*, 812 S.W.2d 388 (Tex.App.—Austin 1991, writ denied), to support the proposition. The Court in *Gutierrez* held that TEX.REV.CIV.STAT.ANN. art. 852a § 8.09(f) is jurisdictional. *Id.* at 391. However, Orange failed to file its contest to this denial and sue upon its claim within three months of the receiver's rejection of the

---

rights asserted by the claimant; and shall be signed and sworn to by the claimant.

(e) Within three months after receipt of any claim ... the liquidating agent shall ... approve or reject such claim in whole or in part. * * * If the liquidating agent rejects any claim in whole or in part, or if he denies any right of priority of payment or any other right

asserted ... he shall notify the claimant of his action by registered mail.

(f) *Any claimant may,* within three months from the day of mailing of notice by the liquidating agent ... *sue upon such claim in the district court of Travis County, Texas;* otherwise the action of the liquidating agent shall be final and not subject to review.

claim (the filing of the injunction proceeding to prohibit the foreclosure) as required by the Act. Rather, First Heights filed a formal claim over a year later, in October, 1989, and then attempted to transfer the suit to Travis County to contest the denial, requesting that the entire suit be abated on jurisdictional grounds should the transfer be denied. This action came too late under the Texas Savings and Loan Act. Gutierrez's formal denial of Orange's claim on September 30, 1988 became final and no longer subject to review on December 30, 1988. Point of error 28 is overruled.

By its 29th point of error, First Heights maintains that Judge Valdez, the ultimate presiding judge in this case, erroneously refused to rehear its Rule 257 Motion to Transfer Venue on the grounds that an impartial trial could not be had in Cameron County.

The Cameron County trial judge in whose court the case was originally filed recused himself for personal reasons. The administrative judge for the region also recused himself because he was a Rio Grande depositor. Chief Justice Phillips of the Texas Supreme Court appointed Judge William Black to hear the case. Although Judge Black stated at the outset that he personally knew Ronald Piperi, one of the named defendants in the case, he did not anticipate that this would prejudice his decision-making ability. None of the parties moved either to strike the appointment or for a recusal.

Judge Black subsequently heard a multitude of pretrial motions, among them First Heights's Motion to Transfer Venue on the basis that an impartial trial could not be had in Cameron County under TEX.R.CIV.P. 257. Judge Black denied the motion.

Two months later, without a motion from any party, Judge Black voluntarily recused himself declaring that he had concerns about his ability to hear the case impartially. Chief Justice Phillips then re-assigned the case to the original judge who presided over it, but First Heights moved to strike the appointment.

Judge Rogelio Valdez, presiding over the 357th Judicial District in Cameron County, voluntarily transferred the case into his own court, with approval from Chief Justice Phillips and notice to all parties. Judge Valdez immediately set a hearing date for pretrial motions. The parties reurged all pretrial motions argued before Judge Black, including First Heights's Motion to Transfer Venue because an impartial trial could not be had in Cameron County. See TEX.R.CIV.P. 257. First Heights reurged that motion solely on the grounds that Judge Black could not have ruled on it impartially; First Heights did not move for rehearing on the grounds that new evidence of local prejudice had arisen. Judge Valdez refused to rehear the original motion. The case was set for trial the next day.

Appellant contends that although Judge Black originally heard and denied the motion, because he later recused himself from hearing the case, his denial of the motion to transfer venue must necessarily have been prejudiced and therefore it was fundamental error for Judge Valdez not to rehear the motion. We disagree.

Judge Black presided over the evidentiary hearing on the Rule 257 Motion to Transfer two months before stepping down from this case. He voluntarily, and upon no motion from any party, recused himself because he began having concerns about presiding over the case. When Judge Black first was appointed to the case, he made clear to all parties involved that he personally knew Ronald Piperi, but that he did not expect that fact to hinder his decision-making ability. No motions to recuse him were filed at that time or at any time thereafter. We hold that the decisions made by a trial judge prior to his recusal are not tainted because of the judge's later voluntary recusal.

Nevertheless, we have reviewed the transcript and statement of facts from the hearing before Judge Black on First Heights's Rule 257 motion.

First Heights presented evidence that Rio Grande had 6,249 investors, the majority of whom resided in the Rio Grande Valley: 3,300 in Cameron County, 2,000 in

Harlingen, and 200 in Brownsville. These people would be direct beneficiaries of any recovery by Rio Grande in the lawsuit and would be subject to prejudice, as would their family and friends. First Heights also introduced testimony from Jose Gutierrez, Rio Grande's receiver, who stated that he was aware of newspaper articles regarding the closing of the bank and its losses, the fact that the bank was uninsured, and that a lawsuit was pending. Gutierrez also stated that the Rio Grande story was televised on "ABC Prime Time Live" and was discussed in radio news reports. First Heights showed a videotape of the television news stories aired on the issue.

First Heights next admitted the testimony of a public opinion poll-taker, who evaluated the public's opinion with respect to claims brought by Gutierrez, Rio Grande's receiver. He testified that he used a random sample of registered voters in Cameron County and found that 62% of those polled knew that Rio Grande had failed. He determined from the poll that 50% of the county's population either deposited money with Rio Grande or knew someone who had. Further, the poll indicated that 67% would sympathize with Rio Grande depositors as opposed to a large Houston Bank [First Heights].

On cross-examination, however, it was discovered that only 3% of the registered voters in Cameron County were depositors at Rio Grande. Moreover, First Heights's poll was taken only in English, and the population sample surveyed was not truly representative of Cameron County residents. These revelations served to substantially diminish the credibility and weight to be given First Heights's poll results.

Gutierrez and Rio Grande countered First Heights's evidence with testimony from a Cameron County demographics expert who noted that only 50% of the residents in the county who owned televisions watched the news. Furthermore, only 12,000 to 15,000 people subscribed to the Cameron County newspaper. He testified that people in the area rely on word-of-mouth as opposed to the media to obtain their information, and that the majority of the public has very little interest in the subject matter at issue. Rio Grande's witness also polled the County residents using a bilingual poll-taker and a wider, more representative sample. He found that only 16% of those polled had heard anything lately about Rio Grande. 23% knew lawsuits were pending involving the bank, but only 4% knew who was being sued. The poll-taker stated that the "overwhelming majority" of those polled were not even aware of this lawsuit. Most importantly, only 11% of those polled stated that they could not be fair during this trial.

Rio Grande also entered the testimony of a 14–year Sheriff's Department employee. He traveled all over the area daily, reading the Cameron County newspaper, and listening to the news on the radio and watching it on television regularly. He testified that after learning that Rio Grande failed, he never heard any more news about the institution.

Finally, a Brownsville Certified Public Accountant, who had been an accountant for 36 years before becoming elected County Commissioner in April 1990, testified that there had been minimal publicity surrounding the Rio Grande closing and related issues.

Rule 257 states, in pertinent part,

A change of venue may be granted in civil causes ... for any following cause:

(a) That there exists in the county where the suit is pending so great a prejudice against him that he cannot obtain a fair and impartial trial.

(b) That there is a combination against him instigated by influential persons....

(c) That an impartial trial cannot be had in the county where the action is pending.

(d) For other sufficient cause to be determined by the court.

Judge Black held that the County was not so prejudiced *at that time* as to warrant a finding that First Heights could not get a fair trial. The Judge stated that such a determination and resultant transfer of the case to another county would be "pre-

621

mature" and that one would have to survey an actual jury panel to discern prejudice. After reviewing the statement of facts from the venue hearing, we do not find that Judge Black erred by refusing to transfer venue on the grounds of inability to obtain a fair trial. First Heights failed to urge any additional reasons for, or present additional evidence to warrant, transferring the case in the motion to transfer it presented to Judge Valdez. Therefore, we do not find that Judge Valdez erred by declining to reconsider the matter. Point of error 29 is overruled.

■■■ By point 30, First Heights maintains that Judge Valdez improperly transferred this case into his court, the 357th District Court, from the 107th District Court where it originally was pending. Both courts are in Cameron County. First Heights asserts that Judge Valdez lacked jurisdiction to hear the case. Appellant calls this action "an obvious sham to avoid the procedural protections of the Texas Government Code, which would have allowed any of the defendants other than First Heights to strike any judge appointed by Chief Justice Phillips."

After Judge Black voluntarily recused himself, Chief Justice Phillips re-assigned this case to the original presiding judge. First Heights filed an objection to the appointment pursuant to TEX.GOV'T CODE ANN. § 74.053(b) (Vernon Supp.1992), and thus the judge could not preside.

Judge Valdez, presiding judge of the 357th District Court of Cameron County, transferred the case into his own court for trial. He and Chief Justice Phillips had a conference call with all counsel involved and informed them that he had taken over the case. Chief Justice Phillips reiterated this discussion in a letter to all attorneys, stating that Valdez had indicated his intention to transfer the case into his court, thus ending Justice Phillips's "participation in this case."

Three statutes and rules are cited to us as applicable to Judge Valdez's transfer of the matter for trial.

TEX.R.CIV.P. 330(e), "Exchange and Transfer," provides in pertinent part,

Where in such county there are two or more district courts having civil jurisdiction, the judges of such courts may, in their discretion, ... transfer cases and other proceedings from one court to another, and any of them may in his own courtroom try and determine any case or proceeding pending in another court without having the case transferred ... and every judgment and order shall be entered in the minutes of the court in which the case is pending and at the time the judgment or order is rendered....

TEX.GOV'T CODE ANN. § 24.003(c) (Vernon 1988) provides that in counties with five or more district courts (Cameron county has five), if a district judge is absent, sick, or disqualified, any of the district judges in the county may hold court for him or her, or transfer a pending case to the court of another district judge in the county.

The Cameron County Local Court Rules allow for the transfer of cases. Section 1.1(d) provides that,

*Except as hereinafter provided*, after assignment to a particular court, every case shall remain pending in such court until final disposition, unless transferred pursuant to these rules, *state statute*, or court order. (emphasis added).

Appellant contends that rule 1.1(f)(1) served to deprive Judge Valdez of his power to transfer this case. That section reads,

Pursuant to TEX.REV.CIV.STAT.ANN. art. 200b (Supp.1982–83), the *presiding* judge may, upon notice and hearing, transfer any case from the court in which same is pending to any other court having subject matter jurisdiction.

(emphasis added).[25] Appellant maintains that Judge Valdez was not the presiding judge and therefore lacked the power to transfer the case. Because this local code

---

**25.** Article 200b was repealed and replaced by TEX.GOV'T CODE ANN. § 75.011, which was also repealed effective August, 1989.

section addresses only a presiding judge's ability to transfer a case, and not that of a fellow district judge, the section is inapplicable.

Both Rule 330(e) and Government Code section 24.003(c), however, authorize Judge Valdez's transferring the case into his court, located within the same county in which the case was pending. Point of error 30 is overruled.

## V. PLAYA CREDIT

By Points 5 and 38, the appellant contends that the trial court erred by admitting evidence and allowing a trial amendment concerning the "Playa Credit." In 1985, Rio Grande and Orange both made loans to Playa del Rio Corporation for the development of the Playa del Rio property. Rio Grande borrowed the money it loaned, $2 million, from Orange. Rio Grande continued to owe that money to Orange at the time of the June 30, 1986 transaction at issue. Consequently, the $20 million note Rio Grande executed to Orange included that $2 million in pre-existing debt.

On April 27, 1988, Rio Grande and Orange (then Champion) entered into a settlement agreement, re-executing it in August 1988 after Gutierrez became Rio Grande's liquidating agent. The agreement directed that the Playa del Rio loan would be credited against Rio Grande's $20 million note indebtedness. First Heights objected to the admissibility of evidence of the credit, both because the *D'Oench Duhme* Doctrine prohibited it as an outside agreement not evidenced in Orange's loan files, and because the credit was not originally pleaded by plaintiffs.

 If a claim against the FSLIC or its transferee is based on an agreement, it must meet the requirements of 12 U.S.C. § 1823(e), which codified *D'Oench. Garrett*, 938 F.2d at 595; *RSR Properties, Inc. v. FDIC*, 706 F.Supp. 524, 532 (W.D.Tex. 1989). The statute and the common law established in *D'Oench* are to be applied concurrently, as the statute is no more strict than the common law, and the two have the "same goal." *Royal Bank of Canada v. FDIC*, 733 F.Supp. 1091, 1095

(N.D.Tex.1990). 12 U.S.C. § 1823(e) provides,

(e) **Agreements against Interests of Corporation**

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, *contemporaneously with the acquisition of the asset by the depository institution,*

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously from the time of its execution, an official record of the depository institution.

(emphasis added). The agreement alleged by the borrower to have been entered into must occur at the same time the asset—the note—is being acquired by the bank in order to be enforceable. *Langley*, 484 U.S. at 92, 108 S.Ct. at 401–02; *RTC by FDIC v. Crow*, 763 F.Supp. 887, 892–93 (N.D.Tex. 1991). In *Crow*, the borrower executed several notes to the bank, then, five years later, the parties entered into refinancing agreements. The borrower attempted to enforce these refinancing agreements against the FDIC when the FDIC sought payment on the outstanding notes. The Court held that such agreements did not meet § 1823(e)(2) and therefore were unenforceable to diminish the FDIC's interest in those notes. *Crow*, 763 F.Supp. at 892–93. We note that an agreement that meets § 1823(e) prevails even if the FDIC does not know about it, and an agreement that does not meet § 1823(e) fails even if the FDIC does know about it. *Crow*, 763 F.Supp. at 893 (quoting *Langley*, 484 U.S. at 92, 108 S.Ct. at 401–02).

Here, although the FDIC did know about the agreement between Rio Grande and Orange, that agreement was entered into almost two years after Orange acquired the $20 million note to which the agreement applies. Because this agreement was not entered into contemporaneously with Orange's acquisition of the note, it violates § 1823(e)(2) and is unenforceable against First Heights as the FDIC's transferee. Consequently, *D'Oench, Duhme* applies to bar all evidence of the Playa Credit here. The trial court improperly admitted such evidence and allowed a trial amendment on the issue. Moreover, the Playa Credit should not have been subtracted from Rio Grande's outstanding balance on the note. We find that the total amount due and owing on the note is $358,297.90 as found by the trial court, plus the $2,092,223 Playa Credit loan, plus interest. Points 5 and 38 are sustained.

### VI. ATTORNEY'S FEES

By a portion of point 13, appellant asserts that because it established its counterclaim for payment on the $20 million note, that note contains a clause that allows First Heights, the present holder of the note, to receive 10% attorney's fees on the balance due at the time it was placed in the hands of an attorney for collection. Because the trial court upheld the validity of the note in its judgment, we find that First Heights is due 10% of the balance. That balance is $358,297.90, as the court found, plus $2,092,223.00, the amount of the Playa Credit which we have found the court erroneously subtracted from the balance, plus interest. We hold that First Heights is entitled to 10% attorney's fees on $2,450,520.90, plus interest. Point 13 is sustained in part.

By point 12, appellant asserts that the trial court's award of attorney's fees to Rio Grande must not stand. Those fees were awarded because Rio Grande prevailed at trial. First Heights maintains that because the judgment of the trial court must be reversed, the award for attorney's fees cannot stand. Because we are not reversing and rendering the judgment of the trial court, point 12 is overruled.

### VII. MOOT POINTS

Because we have found that the trial court properly upheld the validity of the $20 million note, several of First Heights's points of error pertaining to the illegality of the note and the invalidity of the underlying transaction are not dispositive pursuant to TEX.R.APP.P. 90(a). These include points 7, 11, 17, 25 and 26.

Moreover, all issues pertaining to the claim, charge, or evidence submitted regarding Piperi's fraud are not dispositive here (points 8, 9, 18 through 22, and 35). Piperi was an individual co-defendant in the underlying suit. He failed to timely file an appeal bond and his appeal was dismissed. He is not a party to this appeal, rendering any point of error relating to the judgment against him not dispositive.

The judgment of the trial court is MODIFIED to increase the balance due and owing on the outstanding note to $358,297.90 plus the $2,092,223 Playa Credit, plus interest, as well as to award attorney's fees to appellant of 10% of the $2,450,520.90 balance due on that note, plus interest. As modified, the judgment of the trial court is AFFIRMED.