Jim HACKNEY and Albert Spiller, Individually and as Beneficial Owners of Jim Hackney Chevrolet, Inc., Appellants,

v.

FIRST STATE BANK OF HONEY GROVE, Appellee.

No. 06–93–00015–CV.

Court of Appeals of Texas, Texarkana.

Oct. 13, 1993.

Rehearing Denied Nov. 2, 1993.

James M. Morris, Kennedy, Minshew, Campbell, Morris, Sherman, for Jim Hackney and Hackney Chevrolet, Inc.

David C. Turner, Jr., Bonham, for Albert Spiller.

Jonathan P. Ayers, Dallas, John L. Tidwell, Gooding & Dodson, Texarkana, for First State Bank of Honey Grove.

Ed T. Smith, Bonham, for Goss.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

BLEIL, Justice.

Jim Hackney and Albert Spiller, individually and as beneficial owners of Jim Hackney Chevrolet, Inc., collectively referred to as "the dealership," appeal from a take-nothing judgment in their case against First State Bank of Honey Grove for tortious interference with the dealership's business relationships. The principal issues in this appeal involve the loss of the trial exhibits and the sufficiency of the evidence supporting the jury's damages findings. We find no reversible error in connection with the lost trial exhibits, but we reverse because the finding of no damages is against the great weight and preponderance of the evidence.

Jim Hackney Chevrolet, Inc., was organized in November 1976 and obtained a new vehicle line of credit from General Motors Acceptance Corporation (GMAC). Jim Hackney, David Buster, and M.H. Goss, Jr. were the original owners of the dealership.[1] Albert Spiller bought an ownership interest in the dealership in the spring of 1977.

Goss was a member of the board of directors of the bank and helped establish a banking relationship between the bank and the dealership. The bank's president and controlling shareholder during this time was Robert Howard, an attorney.

The bank loaned the dealership operating capital and financed some of the used car inventory. This is called floor planning. The bank also purchased the dealership's installment notes with recourse. In connection with this recourse paper, the bank required the dealership to establish reserve accounts. Hackney testified that the reserve accounts also served as collateral to secure the dealership's overdrafts, although Howard and Dan Hiett, an officer of the bank, denied that the bank made any arrangements regarding the dealership's overdraft privileges.

On December 29, 1977, the bank refused to pay $25,000.00 in checks written to GMAC because there were insufficient funds in the dealership's checking account. In an effort to cover the checks, Spiller presented the bank with a $25,000.00 check drawn on Buster's checking account at another bank. The bank had previously accepted similar checks without question, and none of those checks had bounced. On this occasion, however, the bank called the other bank and found out that there were insufficient funds in Buster's account to cover the check at that time. The bank refused to give immediate credit on the check and also took back the deposit slip which showed that $25,000.00 had been deposited into the dealership's account.

The bank admitted that, if it had chosen to pay the checks, there were sufficient funds in the reserve accounts to cover the dealership's checks to GMAC. The return of the unpaid checks to GMAC resulted in the loss of the dealership's new vehicle credit line. The dealership failed and was liquidated in 1978.

Hackney and Spiller, individually and on behalf of the dealership, sued the bank for tortious interference with the dealership's business relationships that caused the dealership to lose its line of credit and floor planning arrangement with GMAC. The jury found that the bank had tortiously interfered with the dealership's business relationships and that this conduct was a proximate cause of damages to the dealership. The jury also found that the bank acted with actual malice and awarded the dealership $250,000.00 in punitive damages.

The only actual damages questions in the charge required the jury to find the difference in the market value of the dealership immediately before and immediately after December 29, 1977. The jury found no difference. Based on these findings, the trial

---

1. Goss recovered on a claim, in a case consolidated with this one, against Hackney and Spiller, but that part of the judgment has not been appealed and is now final.

court entered a take-nothing judgment against Hackney, Spiller, and the dealership.

The original trial exhibits were lost and could not be made a part of the appellate record. When an appellant raises legal and factual insufficiency points, a complete or agreed statement of facts is essential to his appeal. *See Englander Co. v. Kennedy*, 428 S.W.2d 806, 807 (Tex.1968); *Rowlett v. Colortek, Inc.*, 741 S.W.2d 206, 208 (Tex.App.—Dallas 1987, writ denied). It is undisputed that the dealership made a timely request for the records and that the loss of the exhibits is not the fault of the dealership. The trial court held a hearing, found that the trial exhibits could be replaced, and ordered that the replacement exhibits be made a part of the appellate record.

The dealership contends that it is entitled to a new trial pursuant to Rule 50(e) of the Texas Rules of Appellate Procedure because it did not agree to the substituted documents. *See* Tex.R.App.P. 50(e); *Owens–Illinois, Inc. v. Chatham*, No. B14–91–00539–CV (Tex. App.—Houston [14th Dist.] Sept. 2, 1993, n.w.h.); *Hidalgo, Chambers & Co. v. FDIC*, 790 S.W.2d 700, 702 (Tex.App.—Waco 1990, writ denied). In *Hidalgo*, the court ruled that the appellants were entitled to a new trial because they had not agreed to the substitution of other documents for the lost trial exhibits. The court held that the appellants did not need to have any reasonable basis or justification for not agreeing to the substitution. *Hidalgo*, 790 S.W.2d at 702; *see also Owens–Illinois*, No. B14–91–00539–CV, slip op. at 16 (citing to the *Hidalgo* case).

Contrary to the dealership's position is *First Heights Bank, FSB v. Gutierrez*, 852 S.W.2d 596 (Tex.App.—Corpus Christi 1993, writ requested). Like the dealership, the appellant in *Gutierrez* maintained that he was entitled to a new trial under Rule 50(e) because some of the trial exhibits were lost. The court of appeals upheld the trial court's substitution of exact duplicates of the lost documents even though the appellant had not agreed to the substitution. *Id.* at 617.

To hold otherwise, when an original trial exhibit cannot be found, the losing party could always refuse to accept the substitution in order to obtain a new trial. What the dealership urges would hinder the goal of judicial economy and would not be in keeping with the purpose of Rule 50(e). *Id.*

Admittedly, it is not enough to have before us exhibits that *might* have been presented to the jury; however, if the lost exhibits can be replaced with identical or substantially similar documents, then a party's refusal to agree to the replacement exhibits should not automatically require a new trial under Rule 50(e). *See Adams v. Transportation Ins. Co.*, 845 S.W.2d 323, 326–27 (Tex. App.—Dallas 1992, no writ) (noting that if a reconstruction of the original exhibits is possible, the loss or destruction of those exhibits would not be reversible error). The dealership claims that the substituted documents are inferior because doubts about the documents' accuracy exist and some of the documents are illegible.

The bank called one witness, James S. Moss, who was lead counsel for the bank during the trial, to authenticate the substituted documents. Moss testified that he was ninety-nine percent certain that the documents offered as substitutes were true and correct copies of the trial exhibits. The dealership produced no evidence tending to show that any of the duplicate exhibits was not a correct copy. Arguing that thousands of documents had been produced during discovery and many of these documents were confusingly similar, the dealership made a running objection to all of the substituted exhibits.

Comparing the substituted documents to their corresponding descriptions in the original statement of facts, we find that the substituted exhibits are substantially the same as the original trial exhibits. None of the dealership's objections create serious doubts about the authenticity, accuracy, or completeness of the substitutes. *See, e.g., Owens–Illinois*, No. B14–91–00539–CV, slip op. at 20, 24 (holding that the appellant was entitled to a new trial since he did not agree to the substituted exhibits and, alternatively, because the substituted exhibits were incomplete and of questionable accuracy); *Adams*, 845 S.W.2d at 326 (finding that the substitut-

ed exhibits were unsuitable because they contained substantially more documents than were offered and admitted at trial). The original exhibits were suitably replaced.

■ The dealership attacks the evidentiary support for the jury's findings that the dealership's market value both immediately before and immediately after December 29, 1977 was $500,000.00. One of the dealership's assertions is that this finding of no change in value is against the great weight and preponderance of the evidence.

The dealership's economics expert, Anthony George, testified about the dealership's market value immediately before and after December 29, 1977. George stated that the dealership's loss of its floor plan arrangement and line of credit with GMAC caused by the dishonored checks meant that the business would be almost worthless. George testified that without a line of credit from GMAC the dealership had only a salvage value, as measured by the buildings and equipment that could be sold, and no longer had any value as a going business. The dealership continued its operations for several months after the loss of its floor plan arrangement with GMAC.

Jerry Talley, an expert on banking practices, testified that he had worked with car dealerships in the past and knew that GMAC would immediately terminate a dealer's new car floor plan if the dealer "bounced a check" to GMAC. Talley noted that this termination would, in effect, shut down a dealership. Buster also testified that the GMAC line of credit was essential to the survival of the business. Buster, Spiller, and Goss went to the GMAC office in early January of 1978 and were told that the dealership was out of business because GMAC had not received payment for the cars.

■ There is no evidence contradicting the testimony that the loss of the floor plan arrangement and line of credit with GMAC hurt the value of the dealership. As a general rule, it is ordinarily the prerogative of the jury to set damages, but it has no authority to ignore undisputed facts and arbitrarily fix an amount of damages neither authorized nor

supported by the evidence. *Thomas v. Oil & Gas Bldg., Inc.,* 582 S.W.2d 873, 881 (Tex. Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). Weighing all of the evidence both for and against the jury's finding, the jury's failure to find some decline in the dealership's fair market value immediately after December 29, 1977, is against the great weight and preponderance of the evidence.

The judgment, insofar as it orders that the dealership take nothing against the bank, is reversed and remanded for a new trial.